Marcia L. SAXTON, Plaintiff,

v.

AMERICAN TELEPHONE & TELE-
GRAPH COMPANY (successor to AT &
T Bell Laboratories), Defendant.

No. 90 C 4792.

United States District Court,
N.D. Illinois, E.D.

Feb. 7, 1992.

James William Holman, Cellucci, Yacobellis & Holman, Naperville, Ill., for plaintiff.

Charles Clark Jackson, Camille Annette Olson, Lee P. Schafer, Seyfarth, Shaw, Fairweather & Geraldson, Thomas H.W. Sawyer, James M. Staulcup, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiff Marcia Saxton (Saxton) brought this Title VII action against defendant American Telephone & Telegraph Company (AT & T), alleging sexual harassment in the workplace. Before us now is defendant's motion for summary judgment. For the following reasons, we grant defendant's motion.

## I. FACTS

Saxton began her employment with AT & T (Naperville, Illinois) in August 1986, as a Senior Design Associate (SDA) on the design engineering staff. In June 1987, she met Jerome Richardson (Richardson), a supervisor in one of AT & T's testing groups. Several times between June and December 1987, the two had lunch together. During one of these luncheons Saxton expressed some interest in transferring to Richardson's group. She transferred into Richardson's group in January 1988 as a Senior Technical Associate (STA).[1]

In April 1988, Saxton and Richardson agreed to have drinks after work one evening. They left work together and drove in Richardson's car to a local bar, where they stayed for two hours. Richardson suggested, and Saxton agreed, that they go to a jazz club located in Chicago. In several instances while at the club, Richardson rubbed his hand up and down Saxton's upper leg—Saxton told Richardson to stop, moved his hand, and stated that he could get into trouble for what he was doing. As the two left the club it started raining. Richardson pulled Saxton into a nearby doorway and kissed her for two to three seconds before she pushed him away. Once in the car, Saxton told Richardson to never do that again, and he apologetically agreed. Richardson then drove Saxton back to her car at the company parking lot.

Two weeks later, Saxton and Richardson lunched together to discuss Saxton's transition to the project management tools group.[2] They took separate cars to a local restaurant, but upon finding it closed Saxton joined Richardson in his car and they drove to another restaurant. After lunch, Richardson drove to a nearby park. He parked his car, got out and proceeded to walk down a hill. Because "it was spring, and the daffodils were blooming" Saxton decided to get out of the car and walk around. At some point soon thereafter, Richardson "lurched" at Saxton from behind some bushes. Saxton ducked and ran

---

1. Apparently, although not clear, an STA does lab-related work. In any event, Saxton claims that Richardson promised her the higher position of Member of Technical Staff (MTS), but never delivered. This is disputed by defendant. Resolution of this matter is not necessary to our decision.

2. This group would provide Saxton with more enriching work than she was receiving. This was not, however, the promotion to MTS that she claims she was promised.

several feet to avoid Richardson. She, as in the previous incident, told him he could get in trouble for his conduct, after which Richardson became quiet. According to Saxton, this was the last incident in which Richardson displayed sexually inappropriate behavior.

After the park incident, Saxton claims that Richardson continued to harass her, not sexually, but by not speaking to her, acting in a condescending manner, and by teasing her about her personal relationship with another co-worker, Omar Altaji. More specifically, in his supervisory role Richardson never seemed to have time to meet with Saxton and would frequently cancel meetings that had been scheduled. Saxton admits, however, that Richardson was very busy during this time and hardly had time for anyone. When the two did talk, Richardson would appear impatient, short, and spoke to Saxton as if she were a child. This went on from April until October 1988, although it was during this time that Richardson did assign Saxton work in the project management tools group.

In October 1988, Saxton decided to speak with AT & T supervisor Kamla Garg about her situation. Garg informed Saxton of her options, including speaking with AT & T ombudsperson Patricia Kitterman. After considering her options, Saxton spoke with Kitterman in January 1989. One month later, Saxton filed a formal internal complaint of sexual harassment with AT & T affirmative action counselor Antoinette Thomas, and with Saxton's current department head, Michael Holmes (Holmes). After discussing related company policy and procedure with Thomas,[3] Holmes began investigating Saxton's charges.

Holmes' investigation included interviewing Saxton and several witnesses Saxton identified to corroborate her story, including a woman who Saxton claimed was also a victim of Richardson's sexual harassment. Holmes also received input from Richardson as to his version of the alleged harassment. Holmes concluded that there was inconclusive evidence of sexual harassment. As support for this conclusion, Holmes cited conflicting reports between Saxton and Richardson.[4] The woman identified by Saxton as another victim of Richardson's sexual harassment, Fay Trespalacious, emphatically denied any such harassment. Trespalacious stated that she was being harassed by Saxton because Saxton was spreading rumors about her and Richardson. The other witnesses interviewed by Holmes at Saxton's behest provided no corroborating information.

Holmes nevertheless concluded that Richardson exercised "poor management judgment" in pursuing a personal relationship with Saxton, a subordinate. Holmes also perceived a "communication problem" between the two principals, while noting that Saxton had an "extremely distrustful" perception of Richardson's objectivity as manager. As a result of these findings, Holmes decided that Richardson and Saxton should be separated and that Richardson should take a refresher course on AT & T's policy on sexual harassment. At his deposition, Richardson testified that he never took the course. Holmes also testified that he considered suspending Richardson for one week, without pay, but he never followed through.

During the investigation Holmes offered and Saxton accepted an invitation to work

---

3. Holmes learned through Thomas and AT & T's "EO/AA Redress Procedure" that he was to act as an impartial information gatherer, obtain any documentation, interview witnesses, maintain confidentiality except to the extent necessary for a full and fair investigation, write a report on his investigation detailing the complaint and his findings of fact, review his findings and proposed recommendations with Thomas, take appropriate corrective disciplinary action, and follow up on his findings, recommendations and action with complainant and the alleged harasser.

4. Richardson stated that he and Saxton had at one time expressed a mutual interest in each other. He also stated that although he initiated kissing Saxton when the two left the jazz club, she initiated kissing him upon returning to the AT & T parking lot. Richardson's account of the park incident was that the two held hands as they walked and talked. He said that when Saxton told him she was no longer interested in him, he replied, "Fine." About two months later he invited Saxton to dine with him and she declined.

at home. On March 19, 1989, after reviewing the results of the investigation with Saxton, Holmes learned that Saxton was not interested in transferring to another department. He therefore allowed her to continue working at home until Richardson could be transferred. On March 27, it was decided that Richardson would relocate to another department, one-half mile from Saxton's department. Because of company reorganization and other logistical problems, Richardson's move was not effective until April 24. A short time after the investigation, Holmes learned that on two or three occasions Saxton had seen Richardson in her department, for a few seconds per instance, although the two never spoke to one another. To address this, Holmes told Richardson that he should avoid contact with Saxton.

As mentioned earlier, Saxton worked at home during the investigation on a special project for Holmes. In early May 1989, Holmes began efforts to reintegrate Saxton back into his department. On May 15 the two met to discuss Saxton's next job assignment. Because Saxton had recent experience in the project management tools group, and because of additional head count allocated for this area, Holmes requested Saxton to review the project's requirements, examine whether the requirements were complete, and to explore with other project members where they were in terms of the project. Saxton was also told to choose the portion of the work that best met her skills and experience. Holmes mentioned to Saxton that they would meet again once she completed this assignment,

at which time he would listen to her input and make a specific job assignment.

After the May 15 meeting a series of computer-transmitted correspondence (E-mail) was volleyed between Holmes and Saxton. On May 18 Saxton sent Holmes a message indicating that she was frustrated and depressed. Saxton stated that she perceived all the jobs to be taken and that it was "very hard for [her] to see anything that [another co-worker] has not staked out as his." She believed that her abilities could be better used in requirement development, as opposed to reviewing existing requirements. She expressed dissatisfaction in taking direction from the project coordinator, Trespalacious, who, as mentioned earlier, is the person who emphatically denied being sexually harassed by Richardson. Saxton's May 18 message also criticized AT & T over its handling of her sexual harassment complaint and included a list of essential elements that any job that she might be assigned must contain. Holmes responded on May 19. He wrote that "it is inappropriate to evaluate what others are doing and to conclude that all the work has been done." Holmes assured Saxton that there was plenty of work to go around and that he gave her his full support. Consistent with Holmes' assessment, Saxton stated at her deposition that she had no reason to believe that she could not make a contribution. The next round of E-mail began on May 23, when Saxton wrote to Holmes that "it's pointless to try and discuss job objectives when there are still outstanding issues to be resolved." [5]

5. The outstanding issues to which Saxton alluded were set forth in an accompanying letter sent by her attorney to Holmes. They included reference to her most recent merit rating, attorney fees for work done in connection with Saxton's charge of sexual harassment, and medical expenses for counselling Saxton received. Holmes commented that these added issues came as a surprise because Saxton's attorney had stated in an earlier letter that "auxiliary issues [were] expendable" if the transfer of Richardson was prompt and had the "desired effects." Saxton also had concerns about the merit rating she received in March 1989, which covered her 1988 job performance. This was conducted by Holmes, although both Holmes and Richardson signed the appraisal. Saxton

was rated "3M" or "average," relative to her peers—there are three categories higher than 3M. Saxton signed her evaluation and declined to include any written input. She is now disgruntled at not being promoted to MTS. We find her discontent to be unwarranted. Holmes explained in his affidavit that an entry-level MTS had to possess at least a Bachelor of Science degree in engineering or computer science from a reputable university. An STA (Saxton's position) typically has a Bachelor of Arts in a non-engineering field from a lesser-regarded college. For an STA to be promoted to MTS, he or she must consistently receive high merit ratings for three to four years. According to Holmes, a one-year promotion can occur on rare occasions if the STA receives the highest

In addition, Saxton requested personal time off until the matter was resolved.

After Saxton's May 23 correspondence, until she was terminated on August 14, Holmes made several attempts to contact her to persuade her to return to work. He wrote her on June 23, June 28, July 19, August 3, and August 9, repeatedly telling her that the arrangement for her to work at home was voided. She also was instructed to see AT & T's medical staff if her health was the reason she had not replied to any of Holmes' admonitions. During this time Saxton received her full salary from AT & T. On August 10, Holmes sent his final letter, requesting Saxton to return to work on August 14, lest she be terminated. There was no reply and Saxton was terminated.

Saxton lodged a Title VII complaint with the Equal Employment Opportunity Commission (EEOC) and on May 16, 1990, the agency issued a notice of right-to-sue. Saxton filed suit on August 16, 1990, 92 days after the right-to-sue letter was issued. AT & T now moves for summary judgment on the following grounds: Saxton's complaint was not filed within 90 days of receipt of the EEOC right-to-sue letter, as required by 42 U.S.C. § 2000e–5(f); she failed to file a charge of discrimination within 300 days of the alleged acts of sexual harassment; her allegations of Richardson's conduct do not constitute sexual harassment; AT & T's internal investigation and resolution of her claim discharges its duty; and her employment termination did not constitute a "constructive discharge" resulting from a "hostile environment." Because resolution of this motion need not involve our exploring each

ground proffered, we limit our discussion to the most compelling.

## II. DISCUSSION

A grant of summary judgment is appropriate when there is no genuine issue as to any material fact, entitling the movant to judgment as a matter of law. In making this determination the court will examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," resolving all doubts in favor of the non-movant. Fed. R.Civ.P. 56(c). The motion will be granted if "there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). After reviewing the record we hold that Saxton is not, as a matter of law, entitled to relief under Title VII.

### A. *Sexual Harassment*

■■■ In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Court made clear that there are two types of sexual harassment that may be actionable under Title VII.[6] The first is the *quid pro quo* type, where the sexual misconduct is "directly linked to the grant or denial of an economic *quid pro quo*." *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404–05. *See also Huebschen v. Department of Health and Social Services*, 716 F.2d 1167 (7th Cir.1983). The other, non-*quid pro quo* type, is where the "conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404–

possible rating and has demonstrated unique skills important to the company. Because Saxton fell way short of this criteria, she was properly denied a promotion.

**6.** Title VII provides in pertinent part:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such indi-

vidual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e–2(a).

05 (quoting EEOC Sexual Harassment Guidelines, 29 C.F.R. § 1604.11(a)(3)).

██ It is not clear if Saxton is relying on one or both of the two types of sexual harassment. She describes her work environment after the jazz club and park encounters as "hostile." This clearly speaks to the second type; but, she also states that she was denied a promotion because she did not accede to Richardson's advances. We believe, under either theory, Saxton's experience is devoid of the type of circumstances that support an actionable Title VII claim. Applying the *quid pro quo* type, we find that Saxton has not demonstrated a sufficient link between what we agree was inappropriate conduct on the part of Richardson and the denial of some economic employment benefit. She has not asserted that Richardson, whether directly, indirectly, or remotely, suggested that his conduct was more than inappropriate advances by a person with whom she had apparently become comfortable in one-on-one situations. Saxton only states that Richardson boasted as to how he could bring her over to his department as an MTS, even though she admitted to knowing, before the transfer, that her educational background was insufficient to qualify her as an MTS. Also, once transferred, and after she rebuffed Richardson's advances, Saxton was given the more rewarding assignment in the project management tools group.

██ Saxton fares no better under a "hostile environment" analysis. To create a hostile environment the misconduct "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive work environment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). *See also Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 212–13 (7th Cir.1986). Saxton points to Richardson's condescending remarks, impatient attitude, and teasing about her relationship with Altaji, as evidence of a "hostile environment." Accepting these assertions as true, we believe more is needed to prevail under Title VII.

Case law comes to our aid in providing an idea of what is and is not a hostile environment. *See Waltman v. International Paper Co.*, 875 F.2d 468 (5th Cir.1989) (summary judgment for employer inappropriate where female employee experienced obscenities directed at her that were broadcast over public address system, several instances of inappropriate touching by several co-workers, pornographic material and graffiti prominently displayed, and offensive comments by superiors); *Henson, supra* (employee made out *prima facie* case of sexual harassment where employer subjected plaintiff "to numerous harangues of demeaning sexual inquiries and vulgarities ... and repeatedly requested that she have sexual relations with him"); *Barbetta v. Chemlawn Services Corp.*, 669 F.Supp. 569, 572–73 (W.D.N.Y.1987) (summary judgment for employer inappropriate where plaintiff introduced evidence of pornography in workplace, vulgar comments by co-workers and supervisors, unwanted contact of sexual nature by male employee, and requirement to wear dress or skirt so visiting supervisor could look at legs); *but see Scott v. Sears Roebuck & Co.*, 798 F.2d 210 (7th Cir.1986).

In *Scott*, the Seventh Circuit illuminated what is insufficient to constitute a hostile environment. The plaintiff in *Scott* was a female mechanic-trainee. She alleged that her assigned trainer-mechanic would wink at her, ask to give her a rubdown, ask her out for drinks at one of the mall restaurants, and in response to her requests for help, reply, "What will I get for it?" She alleged that another mechanic on one occasion slapped her buttocks and that another mechanic told her she must "moan and groan" while having sex. Nevertheless, the court affirmed summary judgment for the defendant. The court held that the facts were "not so severe, debilitating or pervasive that it created an actionable hostile environment within the current interpretation of Title VII." *Id.* at 213–14. The court was persuaded by the fact that the plaintiff admitted she considered her mechanic-trainer a friend, and that he never withheld advice or placed the plaintiff in a "disadvantageous position" at work. We

also deem significant the fact that Saxton and Richardson were, at one time, friends. Though Richardson demonstrated, by making sexual advances to a subordinate, a lack of professionalism, there is simply no evidence that his subsequent treatment of Saxton was so pervasive and debilitating that it became "hostile." This is especially true when Saxton admitted that Richardson was very busy during this time and that he cancelled meetings with not just her, but others. Even if Richardson teased Saxton about her relationship with Altaji, and spoke in a condescending manner, this does not rise to the level of affecting the "terms, conditions, or privileges [of Saxton's] employment." "[Plaintiff] is not entitled to a summary judgment ruling in her favor merely because she has raised a fact-oriented issue. She must raise a *genuine* issue of *material* fact in support of her claim." *Scott*, 798 F.2d at 214. Although Saxton is not required to prove her case at this point, she has failed to show a genuine dispute as to any material fact. We hold that a reasonable fact-finder would have to find sexual harassment lacking under these facts.

### B. *Corrective Action*

 Our decision does not rest solely on an insufficient showing of sexual harassment. Assuming a reasonable fact-finder could find sexual harassment to exist under these facts, AT & T took the appropriate corrective action, once notified of the allegation, thus discharging its legal duty. The rule is stated as follows:

> the employer, provided it has used due care in hiring the offending employee in the first place, is liable for that employee's torts against a coworker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action. The employer acts unreasonably either if it delays unduly or if the action it does take, however promptly, is not reasonably likely to prevent the misconduct from recurring.

*Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990).

In *Guess*, a foreman, while in the presence of other male workers, picked the plaintiff up under her arms, sat her down and forced her face against his crotch. She promptly complained to management. The foreman was reprimanded, ordered to stay away from the plaintiff, and denied a promotion and merit raise. The plaintiff brought a Title VII action against Bethlehem. At the close of plaintiff's case the trial court granted Bethlehem's motion for an involuntary dismissal on the grounds that the plaintiff did not establish that Bethlehem failed to take prompt remedial action after discovering the harassment. The appellate court agreed, noting that the "misbehaving foreman was responsive to discipline and that the misconduct was not repeated." *Id.* at 465.

The facts in the instant case, we believe, more strongly support a ruling for AT & T. To begin with, the misconduct in *Guess* was clearly more grotesque than the assertions made by Saxton. AT & T's response, on the other hand, upon learning of Saxton's charges, appears to be comparable to that of Bethlehem's. Holmes, pursuant to AT & T procedure, promptly began a thorough investigation. He interviewed the principals as well as the witnesses whom Saxton proffered to corroborate her version of the facts. These witnesses not only failed to corroborate Saxton's version of the facts, but Trespalacious went so far as to accuse Saxton of spreading false rumors about her and Richardson. Holmes found, and we agree, that there was inconclusive evidence of sexual harassment. He also found, and we also agree, that Richardson acted improperly and that the separation of Richardson and Saxton was in the best interest of all concerned. Holmes, after learning that Saxton was not interested in a transfer, immediately began the process of transferring Richardson. In a month's time Richardson was transferred to another department, one-half mile from Saxton. During this entire process Saxton was allowed to work at home. Nevertheless, Saxton contends that the corrective action did not have the "desired effect." She points to two or three occurrences of seeing Richardson in her department after his transfer

was effective, for about two seconds per instance. We agree with AT & T's assessment that what Saxton perceives to be the "desired effect" is not the proper inquiry. The question is whether the course of action taken by AT & T was "reasonably likely to prevent the misconduct from recurring." *Guess*, 913 F.2d at 465. The misconduct in this case was Richardson's condescending comments, teasing, and impatience. After Richardson was transferred, this conduct ceased. Saxton has not alleged that any of the complained-of conduct has recurred. Therefore, as a matter of law, AT & T's actions were reasonable.

### C. *Constructive Discharge*

■ Notwithstanding the substance of Saxton's sexual harassment charges and the appropriateness of AT & T's response, Title VII only allows for equitable relief.[7] Therefore, Saxton's only possible recovery in this case, since she is not interested in having her employment with AT & T reinstated, is limited to backpay if she was "constructively discharged." *See Brooms v. Regal Tube Co.*, 881 F.2d 412, 423 (7th Cir.1989). "An employer constructively discharges an employee only if it '*makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Weihaupt v. American Medical Association*, 874 F.2d 419, 426 (7th Cir.1989) (quoting *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986) (emphasis in *Bartman*). Whether Saxton's work environment was "so intolerable" as to justify her resignation, must be determined by a reasonable person standard. *Brooms*, 881 F.2d at 423. "An employee may not be unreasonably sensitive to his working environment." *Id.* (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981).

■ While the issue of constructive discharge is normally a question for the trier of fact, thus precluding summary judgment, we conclude that, as a matter of law, the present facts do not constitute a constructive discharge. *See Bailey v. Binyon*, 583 F.Supp. 923, 929 (N.D.Ill.1984). After the AT & T investigation of Saxton's charges and the subsequent corrective action, Saxton unreasonably refused to continue her employment, resulting in a voluntary resignation. The record reveals that after Richardson was transferred Saxton was offered additional work in the project management tools group. Although Saxton admitted there was work available for her in this area, she refused to work in the group because she believed she should have been offered a position in requirement development or as a project coordinator. Why Saxton believed she was entitled to a higher position is not clear. What is clear, however, is that Saxton's working conditions were not "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65 (5th Cir.1980) (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977). Saxton could have pursued a number of other courses while remaining on the job. Instead, she ignored repeated attempts by her manager, admonishing her to report to work. "An employee must seek legal redress while remaining in his or her job unless confronted with an 'aggravated situation' beyond 'ordinary' discrimination." *Brooms*, 881 F.2d at 423 (quoting *Bailey*, 583 F.Supp. at 929). Saxton has not only failed to establish a genuine issue as to any ordinary discrimination, but she falls way short of showing that it would be reasonable to conclude that she was confronted with an aggravated situation beyond ordinary discrimination. In short, as a matter of law, her refusal to report to work was tantamount to a voluntary resignation and

---

7. Title VII provides in pertinent part:
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate.
 42 U.S.C. § 2000e–5(g).

not a constructive discharge as required by Title VII.

## CONCLUSION

We hold that Saxton has failed to establish a genuine issue as to any material fact regarding her allegations of sexual harassment. Also, even assuming Saxton was a victim of sexual harassment, AT & T, as a matter of law, took appropriate corrective action. Finally, Saxton was not constructively discharged and thus not entitled to the relief she seeks. AT & T's motion for summary judgment is hereby granted.