**Marcia L. SAXTON, Plaintiff–Appellant,**

v.

**AMERICAN TELEPHONE AND TELE-GRAPH COMPANY, successor to AT & T Bell Laboratories, Defendant–Appellee.**

No. 92–1545.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1992.

Decided Dec. 3, 1993.

James W. Holman (argued), Cellucci, Yacobellis & Holman, Naperville, IL, for plaintiff-appellant.

Charles C. Jackson, Lee P. Schafer (argued), Seyfarth, Shaw, Fairweather & Geraldson, Thomas H.W. Sawyer, James M. Staulcup, Jr., AT & T Technologies, Chicago, IL, for defendant-appellee.

Before CUDAHY and ROVNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ILANA DIAMOND ROVNER, Circuit Judge.

Marcia Saxton sued American Telephone & Telegraph Co. ("AT & T") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, alleging that she was sexually harassed by her supervisor at AT & T Bell Laboratories.[1] The district court granted summary judgment in favor of AT & T, and Saxton appeals. We affirm.

## I. BACKGROUND

### A. Facts

The facts underlying the district court's summary judgment ruling are largely undisputed.[2] Saxton began working for AT & T's Design Engineering Staff ("DES") in Naperville, Illinois in 1986. In June 1987, she met Jerome Richardson, a supervisor in AT & T's International Division. The two had lunch together several times during the remainder of that year and discussed the possibility of Saxton transferring to Richardson's group. Richardson boasted that he could bring Saxton into his group with Member of Technical Staff ("MTS") status, although this classification typically required a Bachelor of Science degree in engineering or a related field from a reputable university; Saxton had a Bachelor of Arts degree in computer science from a lesser-known college, which ordinarily would qualify her only for the lesser classification of Senior Technical Associate ("STA"). Jan Ronchetti, Saxton's DES supervisor, told her she doubted that Saxton could be transferred as an MTS. Saxton nonetheless accepted Richardson's offer and transferred into his group in January 1988. In February or March, Richardson informed her that she had transferred as an STA rather than an MTS. Richardson explained that Saxton could still earn MTS classification if she proved her abilities, but she never received that promotion.

In April 1988, Saxton and Richardson met for drinks after work at Richardson's suggestion. Saxton had been trying to meet with Richardson in order to discuss her dissatisfaction with her initial lab assignment. After spending two hours at a suburban nightclub, they drove to a jazz club in Chicago, again at Richardson's suggestion. While they were at the jazz club, Richardson placed his hand on Saxton's leg above the knee several times and once he rubbed his hand along her upper thigh. Saxton removed Richardson's hand each time and told him to stop, warning him that he could get into trouble for that kind of conduct. When they left the club, Richardson pulled Saxton into a doorway and kissed her for two to three seconds until she pushed him away. After they returned to Richardson's car, Saxton told him not to do that again, and he agreed.[3] When Saxton repeated her admonition at work the following morning, Richardson apologized and assured her that it would not happen again.

About three weeks later, Richardson invited Saxton to lunch to discuss work-related matters. As Richardson was driving Saxton back to her car after lunch, he detoured through the Morton Arboretum, stopped the car, and got out to take a walk. Saxton decided to do the same and walked off on her own. As she did so, Richardson suddenly "lurched" at her from behind some bushes, as if to grab her. Saxton dashed several feet away in order to avoid him. She again told Richardson that his conduct was inappropriate, and he became sullen. They returned to Richardson's car and finished the drive back to her automobile without further incident.

1. AT & T is the successor to AT & T Bell Laboratories. For convenience, we refer to Saxton's employer simply as "AT & T".

2. Throughout its statement of material facts below, AT & T described the acts of harassment underlying Saxton's complaint as "alleged," without citing evidence tending to show that these acts did not, in fact, occur. (See R. 24, "AT & T's Local Rule 12(M) Statement of Material Facts As To Which There Is No Genuine Issue,"

passim.) For purposes of summary judgment, AT & T has thus conceded that the conduct at issue did take place.

3. Richardson did attempt to put his hand on Saxton's leg once or twice more during the ride home. By Saxton's account, however, Richardson was not as persistent as he had been at the club and stopped when she asked that he do so.

This was the last time Richardson made any sexual advances toward Saxton. She discussed his conduct with a coworker and considered reporting it to AT & T, but decided against making a complaint at that time.

Saxton subsequently perceived a change in Richardson's attitude toward her at work. Although Richardson gave her a more rewarding work assignment, he refused to speak with her, treated her in a condescending manner, and teased her about her romantic interest in a coworker. In addition, Richardson seemed inaccessible and on several occasions canceled meetings that he had scheduled with Saxton.[4] In October 1988, Saxton approached AT & T supervisor Kamla Garg, concerned that her work environment had deteriorated. Saxton mentioned the two incidents that had occurred in April. Garg told Saxton that she could speak with AT & T ombudsperson Patricia Kitterman. Saxton considered the suggestion but did not speak with Kitterman until January 1989, at which time she asked Kitterman whether she could transfer to another department.

In February 1989, Saxton lodged a formal internal complaint alleging sexual harassment. In accord with AT & T procedure, Saxton's department head, Michael Holmes, investigated her complaint. Holmes interviewed Saxton, several witnesses she identified to corroborate her story, and Richardson. Holmes permitted Saxton to work at home during the investigation of her complaint.

Holmes found the evidence of sexual harassment to be inconclusive. In a written report, Holmes noted that Saxton and Richardson had provided conflicting accounts of the relevant events. Richardson had acknowledged that he and Saxton had kissed and held hands but also had suggested that these contacts were consensual and had ended amicably when Saxton expressed a lack of romantic interest in him. Holmes also noted that Fay Trespalacious, a coworker whom Saxton had identified as another victim of Richardson's harassment, had denied any wrongdoing on Richardson's part and had charged that *Saxton* was harassing *her* by spreading rumors of an alleged sexual relationship between Trespalacious and Richardson. Finally, the other individuals with whom Saxton had discussed the incidents had disclaimed any first-hand or detailed knowledge of what had occurred.

Holmes nonetheless concluded that Richardson had exercised poor judgment in attempting to initiate a personal relationship with a subordinate employee and that there was no longer adequate trust and communication between him and Saxton. Holmes therefore decided that Richardson and Saxton should be separated and that Richardson should take a refresher course on AT & T's sexual harassment policy. Holmes considered the possibility of suspending Richardson for one week without pay, but ultimately decided against that sanction. Holmes did decide that his entire department should also be given a refresher course on sexual harassment, which proceeded as planned. Richardson never took the course.

Holmes discussed his findings with Saxton on March 19, 1989 and asked whether she would be interested in transferring to another department. Although Saxton previously had expressed an interest in doing so to Kitterman, she declined Holmes' offer. Holmes thus decided that Richardson should be transferred.

4. There is some evidence in the record suggesting that Richardson treated other employees similarly. For example, Saxton admitted that Richardson was busy and often canceled meetings with other employees. She also acknowledged that Richardson pressured other employees—both male and female—to join him for drinks after work. As for the teasing, Saxton indicated that when she told Richardson that she considered her relationship with the coworker a personal matter that she did not want to discuss with him, he seems to have stopped, although the record is not clear as to whether she had to admonish him more than once. Saxton Dep. at 427–28; R. 24, AT & T Local Rule 12(M) Statement at 9 ¶ 17; R. 26, Saxton Local Rule 12(N) Response at 2 ¶ 17. Finally, although Saxton was never promoted to an MTS position, she did receive the more favorable work assignment from Richardson after the incident in the park. A factfinder might find these circumstances relevant to whether or not Richardson was harassing Saxton. However, granting Saxton the benefit of the reasonable inferences to which she is entitled on summary judgment, none of these circumstances rules out the possibility that Richardson singled her out for particularly harsh treatment after she rebuffed his advances.

On March 27, 1989, Holmes arranged for Richardson's transfer to the Domestic Division of AT & T Bell Laboratories, which was located in a separate building one-half mile away. The transfer was effective April 24, 1989, and Richardson had cleared out his office by May 1. Saxton continued to work at home during the intervening five weeks. Holmes subsequently learned that Saxton saw Richardson in her department on several occasions when she reported to the office shortly after his transfer, although the two did not speak. Holmes responded by admonishing Richardson to avoid any contact with Saxton.

After Richardson's transfer, Holmes attempted to integrate Saxton back into his department. At a May 15, 1989 meeting, Holmes asked Saxton to review an ongoing project and assess which portion of the work would best match her skills and experience. Holmes indicated that he would assign Saxton a particular task once she had done so.

Saxton was dissatisfied with the available opportunities. On May 18, she sent Holmes an electronic message indicating that she was having difficulty identifying an appropriate project assignment that had not already been claimed by someone else. She also criticized AT & T's handling of her sexual harassment complaint and outlined a series of conditions that she viewed as essential to her return to work at AT & T.

Holmes responded via electronic mail on the same day. He assured Saxton that there was plenty of work available on the project and reiterated his request that she identify the type of work she was interested in doing. Holmes expressed his support for Saxton and indicated that he would meet with her the following week to discuss a specific assignment.

Saxton wrote to Holmes again on May 23, stating that "it's pointless to try and discuss job objectives when there are still outstanding issues to be resolved." Saxton enclosed a copy of a letter from her attorney, which identified the following issues: (1) a recent merit rating that Saxton believed was unacceptable;[5] and (2) her request that she be reimbursed for the attorney's fees she had incurred in connection with the sexual harassment charge and for her medical expenses.[6] Saxton indicated that her lawyer would handle these concerns and that she would like personal time off until the situation was resolved.

In a June 23, 1989 letter to Saxton, Holmes noted that Saxton had been absent from work since May 12 and that efforts to contact her by telephone and electronic mail had been unsuccessful. He requested that she inform him immediately of her intentions regarding continued employment with AT & T. Holmes followed up via electronic mail on June 28, 1989. He reiterated that Saxton had not kept him apprised of the work she was doing at home and advised her that he now considered the work-at-home arrangement to be void. Again he requested an immediate response and indicated that he was available to meet with her the following morning.

When Saxton did not return to the office, Holmes wrote to her on July 19, once more requesting that she contact him regarding the status of her work. He also indicated that either Saxton or her physician should contact the company's medical department as soon as possible regarding possible medical

---

5. Holmes had reviewed this rating with Saxton during their March 19, 1989 meeting. Holmes and Saxton's other supervisors had rated her at "3 medium," indicating that she had "fully met objectives" and that her standing was "average" in relation to her peers. Saxton had signed the evaluation and declined an opportunity to respond. The subsequent letter from Saxton's counsel indicated that although Saxton did not challenge the accuracy of the evaluation insofar as it was based on her work under Richardson, she believed that the lackluster rating did not reflect her capability to perform under normal

circumstances and was concerned that it might adversely affect her potential to advance.

6. Saxton confirmed in her deposition that her unpaid medical bills and legal fees were two of the reasons she had been unwilling to return to work and noted the impasse regarding her job assignment as a third reason. She also cited continuing harassment at work, including Richardson's presence in her work area around the time of his transfer (see supra) and ongoing rumors and gossip among her co-workers.

restrictions noted in recent correspondence from Saxton's attorney.[7]

Saxton apparently renewed her request for personal time off until her concerns were addressed. In an August 3, 1989 response, Holmes indicated that AT & T considered all issues to have been resolved, although perhaps not to Saxton's satisfaction. Holmes found Saxton's request for time off to be "unwarranted" and requested that she return to work immediately unless any medical problems prevented her from doing so. He warned her that if she did not report to work by August 9 or provide an acceptable reason for her absence, the company would consider her employment terminated.

When Holmes had not heard from Saxton by August 9, he sent her another electronic message indicating that the company was "very anxious to get you started on a new work assignment but [was] hampered by your unavailability." Holmes again admonished Saxton that her failure to reply would be construed as a decision to terminate her employment.

Saxton did not respond, prompting Holmes to deliver a final warning on August 10, 1989: "[I]f you do not report to work Monday, August 14, 1989 by 8:30 a.m., we will proceed with the processing of your termination of employment."[8] Saxton did not report, and on August 14 Holmes completed a "Resignation Form" indicating that Saxton's employment was terminated because of her failure to return to work.

Meanwhile, on August 10, 1989, Saxton filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On May 16, 1990, at the request of her counsel, the EEOC issued Saxton a "right to sue" letter. She filed this suit on August 16, 1990.

## B. District Court's Ruling

The district court granted summary judgment in favor of AT & T on the merits of Saxton's Title VII claim. *Saxton v. American Tel. & Tel. Co.*, 785 F.Supp. 760 (N.D.Ill. 1992). The court noted at the outset that it was unclear which type of sexual harassment—*quid pro quo* or hostile work environment—Saxton was asserting, but it proceeded on the assumption that she was alleging both. *Id.* at 765.

The court found insufficient evidence of *quid pro quo* harassment because Saxton had not demonstrated a link between Richardson's conduct (which the court agreed was inappropriate) and the denial of any economic benefit to Saxton. In the court's view, Richardson's unfulfilled promise that she would be promoted to MTS status upon transfer was insufficient evidence of a *quid pro quo*, because Saxton had known beforehand that she lacked the educational background to qualify for that classification. The court reasoned further that the more rewarding assignment Richardson gave Saxton even after she had rebuffed his advances negated any inference that Richardson was retaliating for her disinterest. *Id.*

The court also found the evidence insufficient to establish a hostile work environment. The court reasoned that Richardson's condescension, impatience and teasing were insufficient in and of themselves to create a hostile environment. Although the court agreed that Richardson had behaved inappropriately toward a subordinate, it did not find his misconduct so pervasive or debilitating as to be considered hostile. Accordingly, the court concluded that Saxton had failed to demonstrate actionable sexual harassment. *Id.* at 765–66.

The district court alternatively found that AT & T had taken prompt and appropriate corrective action once it was made aware of Richardson's conduct. The court noted that Holmes had conducted a thorough investigation that had failed to corroborate Saxton's version of events. Holmes had nonetheless decided (correctly, in the district court's

---

7. When Saxton visited AT & T's medical department to obtain a medical leave of absence request form, she learned that she needed a psychiatrist's opinion in order to secure such a leave. Saxton chose not to pursue this option.

8. At Holmes' request, the medical department checked its records on August 10 and reported no medical leave request on file from Saxton nor any indication that Saxton was medically unable to return to work.

view) that Richardson and Saxton should be separated and promptly arranged for Richardson's transfer while Saxton worked at home. Although Saxton argued that these measures were insufficient, the court found them legally adequate because they were reasonably likely to prevent the relevant misconduct from recurring. The court noted that the offending conduct ceased altogether once Richardson was transferred. *Id.* at 766–67. [9]

Finally, the court concluded that backpay, the only Title VII remedy that Saxton sought,[10] was precluded because Saxton had "unreasonably refused" to return to work and thus had not been constructively discharged as she asserted. Saxton's belief that she was entitled to a better position than Holmes offered her did not justify resignation; in the court's view, any unresolved concerns could have been handled through

less drastic measures than refusing to report for work. *Id.* at 767–68.

## II. ANALYSIS

■ On appeal, Saxton maintains that when viewed in her favor, the evidence adequately supports claims for both *quid pro quo* harassment and a hostile work environment. She further contends that there are disputed issues of fact concerning the adequacy of AT & T's corrective efforts, and that factual questions also preclude a summary finding that she was not constructively discharged. We review the district court's grant of summary judgment de novo, considering the record in the light most favorable to Saxton and determining whether it presents any dispute of material fact. *Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581, 585 (7th Cir.1992).[11]

---

**9.** The court considered the two or three subsequent occasions on which Saxton momentarily had seen Richardson in her department immaterial. *See* 785 F.Supp. at 766–67.

**10.** Saxton had disclaimed any interest in reinstatement, although such relief is also available under Title VII. Saxton Dep. at 199.

**11.** AT & T argues that Saxton's complaint should have been dismissed because she failed to file suit within 90 days after the EEOC issued her right-to-sue letter. *See* 42 U.S.C. § 2000e–5(f)(1). We find this contention to be meritless. Although section 2000e–5(f)(1) requires that a plaintiff file suit "within ninety days after the giving of" notice by the EEOC of her right to sue, the ninety-day period does not begin to run until the plaintiff or her attorney receives the right-to-sue letter. *Jones v. Madison Service Corp.*, 744 F.2d 1309, 1312 (7th Cir.1984) (per curiam). Saxton's right-to-sue letter was dated May 16, 1990, and Saxton's complaint alleged that her counsel had received the letter "on or about" that same date. R. 1 at 3 ¶ 17 & Ex. 1. If that allegation were accurate, Saxton's suit would be untimely, because the complaint was not filed until August 16, 1990—ninety-two days later. However, Saxton's counsel submitted an affidavit on summary judgment indicating that his firm did not actually receive the letter until May 22, 1990. R. 27, Aff. of James W. Holman at 1–2, ¶¶ 7–9. The affidavit was supported with a photocopy of the letter bearing the law firm's "received" stamp with the same date. *Id.*, Ex. A thereto. The record contains no evidence suggesting that the letter was received before that date. *See* R. 31 at 9, ¶ 7. Saxton's complaint was therefore timely filed.

AT & T also argues that many of the incidents that Saxton has cited as sexual harassment occurred more than 300 days before she filed an EEOC charge, rendering her claims as to these incidents time-barred. *See* 42 U.S.C. § 2000e–5(e)(1). For example, Richardson's advances in April 1988 predated Saxton's August 1989 EEOC charge by more than a year. Yet, as we understand Saxton's claims, they rest not on Richardson's physical advances alone but also on his hostile treatment of her once he was rebuffed. R. 24, AT & T Local Rule 12(M) Statement at 20–21 ¶ 41. *See Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 462 (7th Cir.1990). This could arguably be seen as a single, continuing course of harassment that extended into October 1988 and perhaps beyond (the record is somewhat murky on this timeframe). From that perspective, the entire course of Richardson's conduct could be considered despite the lapse of time since the earliest incidents of purported harassment took place. *See generally Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–381, 102 S.Ct. 1114, 1125–26, 71 L.Ed.2d 214 (1982); *Davidson v. Indiana–American Water Works*, 953 F.2d 1058, 1060 (7th Cir.1992); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989); *Young v. Will County Dept. of Public Aid*, 882 F.2d 290, 292–93 (7th Cir.1989); *Haithcock v. Frank*, 958 F.2d 671, 677–78 (6th Cir.1992). *See also Purrington v. University of Utah*, 996 F.2d 1025, 1028 (10th Cir.1993) (" '[a] hostile environment claim usually involves a continuing violation' ") (quoting *Waltman v. International Paper Co.*, 875 F.2d 468, 476 (5th Cir.1989)). Moreover, AT & T's liability for the harassment in this case hinges upon the adequacy of its response to Saxton's belated internal complaint. *See Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th

## A. *Quid Pro Quo* Harassment

We do not reach the merits of Saxton's *quid pro quo* claim. Although, in an abundance of caution, the district court considered whether the record was sufficient to support a *quid pro quo* theory, it expressed doubt as to whether Saxton even meant to pursue such a claim. *See* 785 F.Supp. at 765. Our own review of both the complaint and the materials Saxton submitted on summary judgment confirms that Saxton relied solely upon a hostile work environment theory. *See* R. 1 at 2 ¶¶ 8–11; R. 25 at 3, 4, 5. Saxton first attempted to articulate a basis for a *quid pro quo* claim in her appellate briefs, and that, of course, is too late. *E.g., Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 n. 3 (7th Cir.1993).

## B. Hostile Work Environment

■ Saxton's principal claim is that she was subjected to a hostile work environment. In order to create a hostile work environment, the conduct at issue must " 'ha[ve] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.' " *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986) (quoting 29 C.F.R. § 1604.11(a)(3) (1985)). *Meritor* explains:

> Of course, ... not all workplace conduct that may be described as "harassment" affects a "term, condition or privilege" of employment within the meaning of Title VII. For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."

*Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)) (citations omitted). Thus, "relatively isolated" instances of non-severe misconduct will not support a hostile environment claim. *Weiss v. Coca–Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir.1993). At the same time, the Supreme Court has now made clear that the plaintiff need not prove that she was psychologically injured:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Harris v. Forklift Sys., Inc.*, —— U.S. ——, ——–——, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993). Thus, to the extent that our prior cases required proof that the harassment "cause[d] such anxiety and debilitation to the plaintiff that working conditions were poisoned," *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 213 (7th Cir.1986), they have been overruled.[12] "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it to be psychologically injurious." *Harris*, —— U.S. at ——, 114 S.Ct. at 371

Cir.1990). All of the company's responsive action (including the investigation of the complaint, the reassignment of Richardson, and Holmes' efforts to bring Saxton back into his department) took place entirely within the 300 days preceding Saxton's EEOC charge. In any event, because AT & T has devoted no more than a skeletal paragraph to this issue, and because the record does not clarify the timing of the last acts of harassment, we will not undertake to parse Saxton's claims in an effort to weed out time-barred incidents. *See Young*, 882 F.2d at 292 ("[a]ll

doubts on jurisdictional timeliness are to be resolved in favor of trial") (citing *Pastrana v. Federal Mogul Corp.*, 683 F.2d 236, 242 (7th Cir. 1982)).

12. To the same effect as *Scott, see Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271 (7th Cir.1991); *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235, 1238 (7th Cir.1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 774 (1990); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 418–19 (7th Cir.1989).

(citation omitted); *see also id.*, —— U.S. at ——–——, 114 S.Ct. at 371–72.

To determine whether the plaintiff's work environment is hostile within the meaning of Title VII, we consider a variety of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, —— U.S. at ——, 114 S.Ct. at 371. Our focus is necessarily on the totality of the circumstances, *id.*, —— U.S. ——, 114 S.Ct. at 371; "no single factor is required," *id.* at 11, —— U.S. at ——, 114 S.Ct. at 371.

■ We evaluate these factors from both a subjective and an objective viewpoint—that is, we consider not only the effect the discriminatory conduct actually had on the plaintiff, but also the impact it likely would have had on a reasonable employee in her position. *Harris*, —— U.S. at ——, 114 S.Ct. at 370.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.

*Id.* —— U.S. at ——, 114 S.Ct. at 370. *See also Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271–72 (7th Cir.1991); *King v. Board of Regents of the Univ. of Wisconsin Sys.*, 898 F.2d 533, 537 (7th Cir.1990); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 419 (7th Cir. 1989).[13] Here, even if we assume that the conduct at issue had a sufficiently adverse effect on Saxton, her claim must still fail, as the objective prong of the inquiry is not satisfied.

■ Although Richardson's conduct was undoubtedly inappropriate, it was not so severe or pervasive as to create an objectively hostile work environment. Certainly any employee in Saxton's position might have experienced significant discomfort and distress as the result of her superior's uninvited and unwelcome advances. At the same time, Richardson's offensive behavior was relatively limited, presumably because Saxton was forthright and persistent in making clear that the advances were unwelcome. And although there were two instances of sexual misconduct rather than one, it simply did not rise to the level of pervasive harassment as that term has been defined by this court. *See Weiss*, 990 F.2d at 337 (no actionable harassment where plaintiff's supervisor asked plaintiff out on dates, called her a "dumb blond," placed his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her on one or more occasions). Indeed, after the Morton Arboretum incident, Richardson made no further advances toward Saxton. *Compare Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 461 (7th Cir.1990) (multiple incidents of sexual misconduct during plaintiff's first two weeks of work did not support hostile environment claim where they ceased after plaintiff reprimanded the aggressor), *with King*, 898 F.2d at 534–35, 538 (repeated verbal assaults and physical harassment that continued despite plaintiff's objections were sufficient to support a hostile environment claim).

Moreover, even if we assume that Richardson turned a particularly cold shoulder to Saxton after she rebuffed his advances, the evidence does not suggest that this behavior rendered her environment hostile. Saxton has offered no evidence that Richardson's conduct was frequent or severe, that it interfered with her work,[14] or that it otherwise

---

**13.** We are not called upon to decide here whether it might be more appropriate to evaluate the plaintiff's work environment from the perspective of a reasonable *woman* as opposed to a genderless reasonable person. *See Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 962 n. 3 (8th Cir.1993); *Ellison v. Brady*, 924 F.2d 872, 879–80 (9th Cir.1991). The result of our analysis would be the same under either standard.

**14.** Title VII, as interpreted by *Harris*, does not require proof that the harassment interfered with the plaintiff's work performance. *See* —— U.S. at ——, 114 S.Ct. at 371 ("no single factor is required"); *see also id.* —— U.S. at ——, 114 S.Ct.

created an abusive work environment. Thus, although it might be reasonable for us to assume that Richardson's inaccessibility, condescension, impatience, and teasing made Saxton's life at work subjectively unpleasant, the evidence fails to demonstrate that his behavior was not "merely offensive," *Harris,* —— U.S. at ——, 114 S.Ct. at 370, but instead was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405. Even if, as Saxton contends, questions of fact remain as to how difficult the work environment became for her, Saxton Br. at 16, that is not enough to avoid summary judgment in the absence of evidence suggesting that a reasonable person would have found the environment to be hostile.

### C. AT & T's Corrective Action

Saxton's claim must fail in any event, because she has not demonstrated that AT & T failed to take prompt and appropriate remedial action upon discovering the harassment. In *Guess v. Bethlehem Steel Corp.,* we set out the rule governing employer liability under Title VII:

> It is not respondeat superior. It is a negligence standard that closely resembles the "fellow servant" rule, from the era when industrial accidents were governed by negligence rather than workers' compensation law. Under that rule, as under Title VII, the employer, provided it has used due care in hiring the offending em-

ployee in the first place, is liable for that employee's torts against a coworker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action. The employer acts unreasonably either if it delays unduly or if the action it does take, however promptly, is not reasonably likely to prevent the misconduct from recurring.

913 F.2d 463, 465 (7th Cir.1990) (citations omitted). *See also Daniels,* 937 F.2d at 1275; *Brooms,* 881 F.2d at 421. Thus, beyond showing that Richardson harassed her, Saxton must produce evidence of a significant shortcoming in AT & T's response in order to hold the company liable under Title VII.[15]

Although AT & T's remedial efforts did not meet Saxton's expectations, they were both timely and reasonably likely to prevent the conduct underlying her complaint from recurring. It is undisputed that the company acted with sufficient dispatch: Holmes began an investigation the day after he was advised of Saxton's complaint, his detailed report was complete two weeks later, and Richardson was transferred to another department within five weeks after Holmes learned that Saxton was not interested in a transfer herself.[16] In view of the fact that nearly a year had elapsed since the principal events underlying Saxton's harassment charge had occurred, AT & T acted with considerable alacrity.[17] Moreover, the company's decision to transfer Richardson was a sufficient safeguard against any recurrence of the harassment. Richardson had long since stopped pursuing Saxton, and his re-

---

at 372 (Scalia, J., concurring) ("the test is not whether work has been impaired, but whether working conditions have been discriminatorily altered"). *But see id.,* —— U.S. at ——, 114 S.Ct. at 372 (Ginsburg, J., concurring):

> [T]he adjudicator's inquiry should center, dominantly, on whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance. To show such interference, "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment." *Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 349 (CA6 1988). It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to "make it more difficult to do the job." *See ibid.*

Justice Ginsburg's concurrence suggests that although proof of an adverse impact on the plain-

tiff's work performance is not required, it remains a particularly important factor in the hostile environment analysis.

**15.** Saxton does not contend that AT & T failed to use due care in hiring Richardson.

**16.** Any stress that the delay in Richardson's transfer might have imposed on Saxton was alleviated by Holmes' decision to allow her to work at home in the interim.

**17.** Saxton does not contend that despite her failure to invoke AT & T's grievance procedure, the company should have been aware of and responded to Richardson's misconduct at an earlier date. *See Waltman v. International Paper Co., supra* n. 11, 875 F.2d at 478.

moval from her department ensured that any fallout she was experiencing as a consequence of rejecting him ceased as well. Indeed, but for the few occasions on which Saxton sighted Richardson in her department following his transfer (uneventful incidents that we view as immaterial),[18] all contact between the two seems to have stopped completely.

No doubt, from Saxton's perspective, AT & T could have done more to remedy the adverse effects of Richardson's conduct. But Title VII requires only that the employer take steps reasonably likely to stop the harassment. *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989); *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 (1st Cir.1980); *see also Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1422 (7th Cir.1986).[19] AT & T satisfied that obligation when it transferred Richardson.[20] Whatever reasons there might be for the company's failure to take additional steps—*e.g.*, following through on Holmes' directive that Richardson take a refresher

course on the company's sexual harassment policy, or suspending Richardson for a week as Holmes had considered—are irrelevant absent evidence suggesting that the transfer was not reasonably likely to prevent the harassment from recurring. In another context, transfer of the wrongdoer to a different department might amount to an ineffectual slap on the wrist; but in this case, it served to terminate all contact between Richardson and Saxton and bring a definitive end to any harassment.[21]

### D. Constructive Discharge

Saxton does not dispute that because she does not seek reinstatement, her prospective relief under Title VII is limited to backpay,[22] and because AT & T did not actually discharge her, she must prove that she was constructively discharged in order to obtain that relief. *See Brooms*, 881 F.2d at 423. "An employer constructively discharges an employee only if it *makes* an employee's working conditions so intolerable that the employee is forced into an ·involuntary resignation." *Weihaupt v. American Medical*

**18.** As the Ninth Circuit recognized in *Ellison v. Brady, supra* n. 13, "in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment." 924 F.2d at 883 (citing *Paroline v. Unisys Corp.*, 879 F.2d 100, 106–07 (4th Cir.1989), *vacated in part*, 900 F.2d 27 (4th Cir.1990) (en banc)). The record in this case, however, does not suggest that Richardson's prior misconduct was so severe or pervasive that his mere presence in Saxton's department would have created a hostile environment.

**19.** Of course, if someone in the employer's decision-making hierarchy engages in harassment, the employer may be held liable regardless of whether it could reasonably have foreseen or prevented the misconduct, for in that instance, the acts of the managerial employee constitute the acts of the employer. *Hunter*, 797 F.2d at 1422. Although Richardson was Saxton's supervisor, the record does not suggest that he was so highly placed in AT & T's hierarchy as to be considered the company's agent, nor does Saxton argue that he should be treated as such.

**20.** Because Holmes decided to transfer Richardson rather than Saxton, we are not confronted with a situation in which the employer's remedial action has left the victim of harassment economically worse off—a result we have characterized as ineffective per se. *Guess*, 913 F.2d at

465. Saxton does contend that her work assignment was never resolved satisfactorily, but the record contains no evidence that AT & T demoted her or treated her unreasonably in seeking out new responsibilities for her after Richardson's departure.

**21.** Saxton noted in her affidavit that around the time of Richardson's transfer, her desk and electronic messages were looked through, her mail was lost, and someone tampered with her answering machine. R. 27, Aff. of Marcia L. Saxton at 1 ¶ 3. Saxton seems to suggest that Richardson was the perpetrator of these misdeeds; yet, there is no evidence in the record to support that inference. *See* Saxton Dep. at 707. Furthermore, although these incidents might generically be described as harassment, the record does not reveal them to have been so severe or pervasive as to support Saxton's hostile environment claim.

**22.** The Civil Rights Act of 1991, which took effect after this suit was filed but before the district court granted summary judgment in favor of AT & T, expanded the remedies available under Title VII. However, Saxton has not sought retroactive application of the Act to her suit and, in any event, we have recently held that the Act's new remedies are not available to plaintiffs who sue based on conduct that occurred before the effective date of the Act. *Mojica v. Gannett Co.*, 7 F.3d 552 (1993) (en banc).

*Ass'n,* 874 F.2d 419, 426 (7th Cir.1989) (emphasis in original) (internal quotation marks and citations omitted). Whether the plaintiff's work environment meets that standard is determined from the viewpoint of a reasonable employee. *Brooms,* 881 F.2d at 423; *see also Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980).

 Nothing in the record indicates that AT & T treated Saxton so poorly that a reasonable employee in her position would have felt compelled to resign. To the contrary, the evidence suggests that AT & T went out of its way to ensure that Saxton was not placed in an uncomfortable or embarrassing position while the company investigated her complaint and took remedial measures. Holmes gave the matter his prompt and thorough attention, permitting Saxton to work at home while he conducted the investigation. Once he concluded that Saxton and Richardson should no longer work together, he allowed Saxton to decide which of the two would transfer by offering that option to her first. When she decided to stay, Saxton was allowed to continue working at home with full pay until Richardson's transfer was completed. Of course, once Richardson was gone, any behavior that might arguably have rendered Saxton's work environment intolerable was terminated. Finally, after Richardson left, Holmes appears to have been sensitive and patient in trying to find a new role for Saxton. Although Saxton maintains that the opportunities Holmes offered to her were inadequate and that her prospective role was not sufficiently defined, there is no evidence that Saxton was forced into an unacceptable post. Instead, the record indicates that Holmes repeatedly attempted to solicit Saxton's input on a new assignment. Only when

those efforts failed and Saxton refused to either return to work or seek medical leave,[23] did AT & T conclude that she wished to terminate her employment. Indeed, that point came only after Saxton had ignored multiple warnings. Whatever lingering dissatisfaction Saxton may have felt regarding the resolution of her complaint or her position at work, her situation cannot reasonably be described as intolerable. The evidence does not, in other words, support an inference that Saxton's decision to abandon her job was effectively coerced by AT & T's actions. Accordingly, the relief she sought in the form of backpay was precluded.

### III. CONCLUSION

The conduct of Saxton's superior was inappropriate and unprofessional. Nonetheless, the record does not reasonably support an inference that the misconduct Saxton has described was so serious or pervasive that it created a hostile work environment within the meaning of Title VII. Nor does the record reveal a material dispute as to the timeliness or efficacy of AT & T's corrective measures once it was apprised of Saxton's concerns. AT & T was therefore entitled to summary judgment on Saxton's Title VII claim. Alternatively, summary judgment in AT & T's favor was appropriate because backpay—the only remedy that Saxton sought—was unavailable in the absence of evidence that Saxton was actually or constructively discharged. For these reasons, we affirm the judgment of the district court.

AFFIRMED.

---

**23.** Saxton argues that Holmes' admonition to report to the company's medical department caused her concern that "management was attempting to pigeon hole her as a crazy woman." Saxton Br. at 8. Indeed, she cites it as "a provocative and mistrustful act" (*id.* at 19) that evidences both the inadequacy of AT & T's response to her complaint and the intolerable conditions under which the company forced her to work (*id.* at 19, 21). However, Holmes' July 19, 1989 letter to Saxton simply noted: "The latest correspondence from your lawyer indicated that you may have some unreported medical restrictions affecting your availability to report to your standard (office) work location. It is important

that you or your medical counsel contact Dr. A.J. Munoz of our medical department as soon as possible." R. 24, Aff. of Michael G. Holmes at 10 ¶ 24 & Ex. M thereto. In a subsequent letter rejecting Saxton's request for a personal leave, Holmes informed her that "[e]xcluding any medical reasons, it is necessary for you to report to work immediately." *Id.* Ex. N. A similar reference was included in Holmes' final warning letter. *Id.* Ex. P. We cannot reasonably infer any condescension, insensitivity, or hostility from these admonitions, and they consequently lend no support to Saxton's contention that AT & T's corrective efforts were inadequate and that she was constructively discharged.