BOARD OF REGENTS FOR REGENCY UNIVERSITIES, for and on Behalf of Sangamon State University, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

Fourth District   No. 4—89—0303

Opinion filed April 11, 1990.

Kenneth G. Kombrink, of Board of Regents of Regency Universities, of Springfield, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Linda J. Hay, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Leahy Law Offices, of Springfield (Mary Lee Leahy and Cheryl Redfield Jansen, of counsel), for respondent Sandra Martin.

JUSTICE McCULLOUGH delivered the opinion of the court:

The Board of Regents for Regency Universities on behalf of Sangamon State University (SSU) appeals a Human Rights Commission (HRC) finding (*In re Board of Regents for Regency Universities,* ____ Ill. Hum. Rights Comm'n Rep. ____ (June 10, 1986, HRC Nos. 1979SF474, ALS417(S))) that it discriminated against Sandra Martin on the basis of her sex when it denied her application for promotion to assistant professor. SSU also contends the attorney fee award was improper. In light of our disposition of this matter, we need not address the attorney fee issue.

SSU argues: (1) the HRC erred in reviewing the findings of the administrative law judge; (2) the HRC erred in applying the *McDonnell Douglas Corp v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817, analysis to the instant case; and (3) the HRC's decision is contrary to the manifest weight of the evidence.

We reverse.

### PROCEDURAL BACKGROUND

On May 14, 1979, Sandra Martin completed a charge of discrimination alleging SSU had denied her request for promotion to assistant professor of learning skills. Martin had been told she had not demonstrated sufficient scholarship in the learning assistance field. Martin alleged she was as qualified or better qualified than two males who were made assistant professors. Subsequently, the Illinois Fair Em-

ployment Practices Commission issued a complaint of unfair employ-
ment practice pursuant to the Fair Employment Practices Act (Ill.
Rev. Stat. 1979, ch. 48, par. 851 *et seq.*, now Illinois Human Rights
Act (Act) (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E))). The complaint
alleged: Martin was hired by SSU in 1972 as a lecturer; she was pro-
moted to faculty assistant in 1975; and she was promoted to instruc-
tor in 1976. Martin applied for promotion to assistant professor in
1979, was qualified for the position, but was denied promotion. The
complaint further alleged she was as qualified as two male assistant
professors, Gary Morgan and Ben Ward. Martin concluded SSU dis-
criminated on the basis of sex in denying her application for promo-
tion. On April 17, 1981, the HRC amended the complaint, adding the
Board as a respondent.

A hearing on the complaint occurred on December 8, 1981, before
administrative law judge James Simpson. However, prior to reaching
a decision, Simpson resigned. On December 23, 1983, the parties stip-
ulated that administrative law judge Patricia Patton could write the
decision based upon the record of the December 8, 1981, hearing.

DECEMBER 8, 1981, HEARING

SANDRA MARTIN

In 1964, Martin received a bachelor of arts degree from St. Louis
University. She graduated *cum laude*. She then studied under a grad-
uate assistantship program at Purdue University. She taught fresh-
man composition, American culture, and studied English literature as
part of the assistantship program. In 1965, Martin started her mas-
ter's program at St. Louis University. She received a master of arts
degree in 1967. During her studies for her master of arts, she taught
freshman and sophomore composition or literature pursuant to a
graduate fellowship. During the 1967-68 school year, Martin taught
English and composition at St. Louis University. Forest Park Commu-
nity College hired Martin in 1968. She taught writing, literature, and
composition. Her classes principally involved minority population
groups who needed remedial assistance.

In 1970, Martin moved to Springfield and worked for the Illinois
Institution for Social Policy, where she developed a form application
for welfare recipients. She also worked as a free-lance editor of the
Journal of the Illinois Constitutional Convention, edited a history of
McLean County, and helped form "Brainchild," a publication of the Il-
linois Women's Poetry Collective. She published numerous articles in
varied areas.

SSU hired Martin in January 1972 as a lecturer. This was a part-time position. Her first assignment at SSU involved teaching writing to grade school and high school teachers. She also taught magazine production and communication in print. In 1974, Martin interviewed for a position in the newly created learning center. She accepted a graduate assistantship, which was a part-time position. Morgan and Ward interviewed Martin for the position. In 1974, SSU hired Morgan and Ward as assistant professors. They were coadministrators of the learning center. In January 1975, Morgan and Ward hired Martin as a faculty assistant in the learning center. In 1976, Morgan and Ward recommended Martin for promotion to instructor within the learning center. Martin testified that Morgan and Ward actually reallocated learning center funds to create the instructor position.

All learning center personnel had similar duties. They all developed the program, tutored students, and publicized the learning center. Martin's principal duties involved teaching writing skills. The learning center was initially an experimental unit. Its purpose was to provide tutorial and related services to students. Martin admitted the learning center movement began in the late 1960's or early 1970's. From 1972 through 1974 there was little opportunity to participate in educational associations in the specialty. She attended the first meeting of the national organization and four meetings of the State association. Martin stated SSU paid for Ward and Morgan's membership in the Illinois and national organization. It did not fund her membership.

Martin admitted nothing in her personnel file indicated membership in any professional organizations for learning skills. She had not written any articles on learning centers or learning skills. Everything she wanted considered regarding her application for promotion should have been in her personnel file.

All but one of Ward's professional activities occurred after 1974. Morgan's activities in the profession began in 1976. Morgan and Ward were active in organizing the Illinois Association for Personalized Learning (IAPL). Ward was director of the organization. Martin stated she assisted Ward in organizing the association. Ward published an article on personalized learning in 1979. Martin agreed that Ward's personnel file showed that he was active in the National Association for Remedial Developmental Studies in Post-Secondary Education (NARDSPE). Morgan was a membership chairperson of the national organization. The national and State organizations were formed after 1974.

In 1979, Martin applied for a promotion to assistant professor.

PROMOTION PROCEDURE

SSU has a multilevel promotion procedure. First, the applicant completes a self-evaluation. This evaluation is reviewed by a personnel committee for the immediate unit. If the personnel committee approves the request, it is sent to a cluster personnel committee. The cluster personnel committee submits its recommendation to the university personnel committee. The university personnel committee's decision is then reviewed by the vice-president for academic affairs. The vice-president for academic affairs recommends the promotion be denied or granted. The vice-president's recommendation is acted upon by the president of the university and the Board of Regents. The learning center was not attached to an academic cluster. Therefore, the second level of evaluations was inapplicable.

The appointment or promotion policy in effect in 1979 stated:

*"Assistant Professor*

For appointment or promotion to the rank of assistant professor, a candidate must have completed at least one year of study beyond the Master's Degree or have clearly demonstrated equivalent competencies as revealed by relevant scholarship, professional experience, or creative work. The amount of formal study beyond the Master's Degree will of necessity vary from discipline to discipline. In most cases a candidate will be expected to have completed all work for a doctorate except for the dissertation. In some disciplines, of course, the Master's degree is considered terminal.

Most new faculty members who have completed an earned doctorate, or all but the dissertation, but who have had no teaching experience except as graduate assistants will be appointed to the rank of assistant professor.

Experience gained as an instructor at Sangamon State University should be considered as part of the professional experience when a candidate for promotion has not earned the doctorate in a relevant field. There should be evidence of substantial individual growth in teaching abilities during the instructorship. The candidate for an assistant professorship must also demonstrate potential to contribute more broadly than the instructor to the missions and mandates of the University. Such evidence may be found in the range of scholarly and professional interests or creative skills as demonstrated by active membership in professional organizations, or by a variety of internal and external services performed in support of university or community programs."

## MARTIN'S APPLICATION FOR PROMOTION

Martin completed all levels of the review procedure. She was favorably recommended at all levels through the university personnel committee. However, Dr. Susan Dezendolet, the vice-president of academic affairs, recommended Martin's promotion request be denied. Martin stated Dezendolet told her she was not active enough in professional organizations which Dezendolet thought were relevant to her position at the learning center. Dezendolet recommended Martin pursue her doctorate and attend more meetings on learning assistance. SSU's president, Alex Lacey, acted on Dezendolet's recommendation.

## GARY MORGAN

Morgan had two master's degrees when he was hired in 1974 as an assistant professor. He and Ward were hired to develop the learning center and were codirectors of it. He was Martin's supervisor. He and Ward had administrative duties as well as teaching duties. Morgan had not done any work toward a doctorate in 1974. Morgan stated that when SSU hired him he had no regular teaching experience at the university level.

Morgan further stated he presented a paper concerning learning centers at a national conference prior to his employment by SSU. After 1974, he was the membership chairperson for the NARDSPE. He had not published any articles in professional journals concerning learning centers. However, he had completed a consulting task with another university. He evaluated its learning center. Morgan stated he was one of the organizers of the IAPL programs. SSU did not pay for his membership in the organizations, but it did fund his attendance at various conferences.

Morgan further testified that it was not feasible for Martin, Ward, and him to attend conferences at the same time. Morgan and Ward, as coadministrators, decided who would attend conferences. Usually, they attended the conferences while Martin worked at the learning center.

## BEN WARD

Ward did not testify at the hearing. His personnel file shows no publication in the learning center field or the personalized learning field in 1974. He did not attend any conferences or meetings in the personalized learning field prior to 1974. Morgan stated he worked with Ward and reviewed his resume. Ward had no university-level teaching experience prior to being hired as an assistant professor in 1974. Ward had a master's degree but had not done any study toward

a doctorate. After Ward was hired as an assistant professor, he helped organize the IAPL programs. Ward attended 10 conferences between 1975 and 1979. In 1976, he published two papers on personalized learning.

## THE RECOMMENDED ORDER AND DECISION

On June 28, 1985, the administrative law judge (ALJ) entered a recommended order and decision. The ALJ concluded Martin had established a *prima facie* case of discrimination, respondent articulated a legitimate, nondiscriminatory reason for the failure to promote Martin, and Martin failed to show the reason was pretextual. The ALJ stated Martin's personnel file and Dezendolet's explanation of the unfavorable recommendation established a nondiscriminatory basis for the decision. The ALJ further stated the difference in treatment between Martin, Morgan, and Ward with regard to membership and activity and professional associations did not indicate the reason was a pretext. The ALJ found scholarship in the personalized learning field had developed between 1970 and 1979. Complainant did not state personalized learning field organizations existed prior to 1974. Therefore, the ALJ found it credible that SSU would have substantially different expectations with regard to participation in professional organizations in 1979 than it had in 1974.

## THE HRC'S DECISION

On June 10, 1986, the HRC entered its order and decision. The HRC agreed that Martin had set out a *prima facie* case of discrimination. It found, however, that the stated reason did not explain why similarly qualified individuals were granted the rank of assistant professor while Martin was not granted that rank. It noted the stated reason must explain the disparate treatment to rebut the *prima facie* case. The HRC then noted no witness explained why Morgan and Ward were granted assistant professorships and no witness explained the difference in application of the criteria for promotion or appointment to Martin.

The HRC then noted the ALJ had accepted respondents' attorney's argument about the possible grounds for disparate treatment as fact and as a substitute for evidence to articulate a reason. The HRC found that complainant should not have to prove that every possible reason articulated by respondents' counsel is a pretext.

The HRC found that SSU failed to articulate a legitimate, nondiscriminatory reason for applying different standards to Martin and the male comparators. The HRC concluded that even if it were to find

SSU had articulated a legitimate nondiscriminatory reason for the disparate treatment, it would conclude Martin had shown the reason to be a pretext. The HRC sustained the complaint and remanded for a determination of appropriate relief and attorney fees. After that determination was made, SSU filed the instant appeal.

### ANALYSIS

■■ Sections 2—102(A) and 1—103(Q) of the Act make it unlawful for an employer to make promotional decisions regarding an employee on the basis of his sex. (Ill. Rev. Stat. 1987, ch. 68, pars. 2—102(A), 1—103(Q).) On judicial review of a decision of the HRC, the HRC's findings of fact shall be sustained unless the court finds they are contrary to the manifest weight of the evidence. (*Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 180, 545 N.E.2d 684, 688; Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(2); *Village of Bellwood Board of Fire & Police Commissioners v. Human Rights Comm'n* (1989), 184 Ill. App. 3d 339, 349, 541 N.E.2d 1248, 1254-55.) Similarly, the HRC "shall adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence." Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E)(2).

■ In analyzing employment discrimination claims, Illinois follows the format set out in decisions analyzing claims made under Title VII of the Civil Rights Act of 1964. (42 U.S.C. §2000e *et seq.* (1982); *Zaderaka*, 131 Ill. 2d 172, 545 N.E.2d 684.) In *McDonnell Douglas* (411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817), the Court set out a three-part analysis of discrimination claims. First, plaintiff must establish a *prima facie* case of unlawful discrimination. If a *prima facie* case is established, a presumption arises that the employer unlawfully discriminated against the plaintiff.

Second, in order to rebut the presumption, the employer must articulate, not prove, a legitimate, nondiscriminatory reason for the challenged action. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 259-60, 67 L. Ed. 2d 207, 219, 101 S. Ct. 1089, 1097; *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687.) The *Burdine* Court stated:

> "[T]he defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity." (*Burdine*, 450 U.S. at 255, 67 L. Ed. 2d at

216, 101 S. Ct. at 1094-95.)

In footnote 9, the *Burdine* Court cautioned that an articulation not admitted into evidence will not meet the burden of production. The Court noted argument alone was insufficient. *Burdine*, 450 U.S. at 255 n.9, 67 L. Ed. 2d at 216 n.9, 101 S. Ct. at 1094 n.9.

If the employer carries the burden of production, the presumption of discrimination drops. The plaintiff then must prove by a preponderance of the evidence that the employer's articulated reason was a pretext for unlawful discrimination. This burden merges with plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully discriminated against the employee. (*McDonnell Douglas*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817; *Burdine*, 450 U.S. at 256, 67 L. Ed. 2d at 217, 101 S. Ct. at 1095; *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687.) Complainant always has the burden of proof. *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687.

■ The factors which constitute the complainant's *prima facie* showing vary with the particular circumstances of each case. (*McDonnell Douglas*, 411 U.S. at 802 n.13, 36 L. Ed. 2d at 677-78 n.13, 93 S. Ct. at 1824 n.13.) Generally, under Title VII in situations involving a denial of promotion in a university setting, the complainant must show (1) he was a member of a protected class; (2) he was qualified for and applied for promotion; (3) he was rejected; and (4) other equally or less qualified persons, who were not class members, were promoted or the benefit remained open. *Wu v. Thomas* (11th Cir. 1988), 847 F.2d 1480, 1483, *cert. denied* (1989), 490 U.S. 1006, 104 L. Ed. 2d 156, 109 S. Ct. 1641; *Dugan v. Ball State University* (7th Cir. 1987), 815 F.2d 1132, 1136.

However, this test is not exclusive. A complainant may set out a *prima facie* case under some circumstances by presenting other evidence creating an inference that the complained of act was unlawful. (*Lynn v. Regents of the University of California* (9th Cir. 1981), 656 F.2d 1337, 1341.) A *prima facie* case of discrimination may be established by direct evidence that similarly situated employees of a different sex were treated more favorably. (*Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 18, 500 N.E.2d 639, 645-46.) Additionally, an employer may not apply an employment qualification unevenly depending upon the sex or race of the applicant. (*McDonald v. Santa Fe Trail Transportation Co.* (1976), 427 U.S. 273, 282-83, 49 L. Ed. 2d 493, 502, 96 S. Ct. 2574, 2580; *Loyola University*, 149 Ill. App. 3d 8, 500 N.E.2d 639; see also *In re Avilez*, XIII Ill. Hum. Rights Comm'n Rep. 137 (1984).) Whether an employer's articulated reason for a challenged action is pretexual is a question of fact.

*Zaderaka*, 131 Ill. 2d at 180, 545 N.E.2d at 688; *Board of Education of Waterloo Community Unit School District No. 5 v. Human Rights Comm'n* (1985), 135 Ill. App. 3d 206, 210, 481 N.E.2d 994, 996.

Initially, SSU argues the HRC erred in rejecting the ALJ's conclusion that it had articulated a legitimate, nondiscriminatory reason for denying Martin's promotion request and erred in rejecting the ALJ's conclusion that Martin had failed to show the proffered reason was a pretext, as these were findings of fact. Martin argues the determinations were conclusions of law, and, thus, were correctly rejected by the HRC. The HRC, in its decision, noted it was required ordinarily to accept the factual findings of the ALJ. However, it rejected the ALJ's recommended decision in the instant case because it believed the ALJ had shifted the burden to the complainant to prove all potential reasons for treating her differently than the male comparators were pretext. Thus, the HRC rejected the recommended decision and factual finding because of a perceived error of law.

■ We agree that ordinarily the HRC must accept the hearing officer's findings that an employer has articulated a legitimate, nondiscriminatory reason for a challenged employment action and the employee has not demonstrated the reason was a pretext, unless those findings are contrary to the manifest weight of the evidence. These are inherently factual matters which both the Act and the courts have stated are best decided by the fact finder. *Zaderaka*, 131 Ill. 2d at 180, 545 N.E.2d at 688; Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E)(2).

■ However, while we do not agree that the ALJ applied an incorrect legal standard in reaching her recommended decision in the instant case, we do not believe the HRC is powerless to reject a recommended decision which is premised upon a misconception of the issues to be proved and the legal standards related to those issues. (*Smith v. Chicago Board of Education* (1988), 176 Ill. App. 3d 109, 530 N.E.2d 1089.) In *Smith*, the court held the HRC properly rejected an ALJ's factual finding of pretext because the finding was based upon a mistake of law. The HRC in *Smith* found the ALJ had elevated the employer's burden of articulating a legitimate nondiscriminatory reason for its actions beyond the burden stated in *Burdine*. In the instant case, the HRC found the ALJ had placed an erroneous burden of proving pretext upon the complainant. The analytical circumstance is substantially similar, although the HRC was discussing different portions of the *McDonnell Douglas* analysis. Thus, the HRC could reject the factual findings inherent in a recommended decision where those findings are premised upon a misapprehension of the law.

■ SSU next argues the use of the *McDonnell Douglas* analysis to establish intentional discrimination is not proper because a person of the same sex as Martin made the recommendation to deny promotion. SSU contends that use of noninferential, direct proof of discrimination is necessary. Martin responds that the underlying premise of the argument is untrue, the action is the focus of the claim, and SSU has cited no authority for its contention. The HRC notes that there is no factual or legal basis for the argument that the sex of the decision maker changes the method of proving discrimination.

SSU has cited no authorities for its argument. An appellate court need not consider an argument which is unsupported by citation to authority. (107 Ill. 2d R. 341(e)(7); *Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 432 N.E.2d 1267; see generally *County of Cook v. Renaissance Arcade & Bookstore* (1988), 122 Ill. 2d 123, 144, 522 N.E.2d 73, 82.) We will not address this argument.

SSU next argues the HRC's decision is contrary to the manifest weight of the evidence and the law. Martin established a *prima facie* case of discrimination by showing (1) she was a member of a protected group, (2) her application for promotion to assistant professor was denied; and (3) men with similar qualifications or less qualifications received that rank.

■ Initially, SSU argues the HRC used an inaccurate *prima facie* case. SSU urges this court to find the HRC erred as a matter of law in not following the *prima facie* case set forth in *Wu* (847 F.2d 1480). The *McDonnell Douglas* Court specifically stated that the elements of a *prima facie* showing of discrimination would necessarily vary with the circumstances of each situation. (*McDonnell Douglas*, 411 U.S. at 802 n.13, 36 L. Ed. 2d at 677-78 n.13, 93 S. Ct. at 1824 n.13.) The critical factor is that complainant's evidence established an inference of discriminatory *animus* for a challenged employment action. Complainant made out a *prima facie* case by direct comparison with similarly situated, nonclass members. The validity of such a *prima facie* showing has been repeatedly recognized. (*McDonald*, 427 U.S. 273, 49 L. Ed. 2d 493, 96 S. Ct. 2574.) The HRC did not err as a matter of law in determining the elements of Martin's *prima facie* showing of discrimination.

■ After a complainant raises an inference of discriminatory motive for an employment action, the employer has the burden of articulating a nondiscriminatory reason for the action. (*Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) This reason must be clearly set forth through the introduction of admissible evidence. Argument, alone, is insufficient to justify a judgment for the defendant. Here,

SSU introduced a letter from its president noting Martin's promotion had been denied because she was not sufficiently active in professional organizations. Martin testified this was the reason for the decision which she and Dezendolet, the vice-president of academic affairs, had discussed. It is not contested that Martin was not active in professional organizations. She had not published any articles dealing with learning centers or personalized learning programs.

Additionally, Martin and Morgan testified that few opportunities existed for professional activity in the specialized learning field in 1974 when Morgan and Ward were appointed assistant professors. Morgan and Ward organized a national and State professional society. Interest and opportunities in the specialized learning field developed between 1974 and 1979.

The ALJ found Martin's lack of professional activities was a legitimate, nondiscriminatory reason for the decision. She noted it was entirely credible that SSU's policy toward professional activities in the learning center field was substantially different in 1974 than in 1979. The HRC characterized this statement as based solely on argument and based upon a misapprehension of *Burdine*.

We do not agree. Under *Burdine*, to satisfy its burden of articulating a nondiscriminatory reason, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory *animus*." (*Burdine*, 450 U.S. at 257, 67 L. Ed. 2d at 218, 101 S. Ct. at 1096.) *Burdine* cautioned that argument alone was insufficient to establish a nondiscriminatory reason.

Although we are troubled by the fact that neither party called Dezendolet to testify, we believe the evidence admitted rationally supports a conclusion that membership in professional organizations was a more critical promotional factor in 1979 than in 1974. (*Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) This is especially true since the national and State organizations did not exist until after 1974 and SSU had instituted the department in 1974, hiring Ward and Morgan to develop the learning center. Therefore, SSU met its burden of producing a nondiscriminatory reason, supported by evidence for any disparate treatment. The proffered reason was not based solely on argument. Under the facts presented here, SSU did not need to present testimony about a change of its policy in considering professional activities.

The HRC also found, alternatively, that Martin met her burden of showing the reason was a pretext. This finding is not supported by the evidence. Martin established women were underutilized at SSU.

However, her evidence did not establish that SSU's expectations with regard to membership in professional organizations had not increased with the development of the field, thus no pretext was shown.

We need not address the propriety of the attorney fee award.

Reversed.

KNECHT, P.J., and STEIGMANN, J., concur.