LUCILLE MOTLEY, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

Fourth District   No. 4—93—0474

Opinion filed June 23, 1994.

Joseph A. Duesterhaus and James L. Palmer, both of Scholz, Loos, Palmer, Siebers & Duesterhaus, of Quincy, for petitioner.

C. Daniel Karnes and John R. Spitzig, both of Burke, Weaver & Prell, of Chicago, for respondent Central Illinois Public Service Company.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Daniel N. Malato and Mary E. Welsh, Assistant Attorneys General, of counsel), for other respondents.

JUSTICE KNECHT delivered the opinion of the court:

Lucille Motley appeals from the dismissal, by the Illinois Human Rights Commission (Commission), of charges of discrimination and constructive discharge. Motley alleges the Commission erred in determining there was a lack of substantial evidence in support of her charges. We disagree and affirm.

## FACTS

Motley began working for the Central Illinois Public Service Company (Company) as a customer information clerk in April 1985. Motley was one of four individuals employed in such a capacity. Motley is black, the other three individuals are white. The guidelines for the classification of the clerks are as follows:

"*C-02 Cashier*—All new full-time and part-time employees with [a high school diploma] will enter in this salary grade.

*C-03 Cashier*—Full-time and part-time cashiers at the C-02 level may be considered for promotion to the C-03 level after one year of service (2000 hours for part-time employees). The primary consideration is progress and performance.

*C-04 Cashier*—Cashiers at the C-03 level may be considered for promotion to C-04 after a total of [three] (3) years experience in the cashier's positions. Service time accrued as a part-time cashier would also be included. The primary consideration is job knowledge and performance. Performance shall be in work of somewhat greater complexity, e.g., handling accounts payable (Emergency Orders, Purchase Orders, Petty Cash, RFP's), customer financial transactions (J.O.'s, Customer Charge Tickets, gas and electric extensions); routine billing errors; data entry on business systems and district office correspondence.

*C-05 Cashier*—Cashiers at the C-04 level will be eligible for consideration of promotion of C-05 after [two] (2) years of service in that grade. Consideration shall be based predominantly on job knowledge and performance. The employee's performance would be in the areas of greatest complexity, e.g., preparing and data entry of Payroll (time, overtime, expenses); preparing P*O*S*T* records and reports; handling complicated billing errors; preparing deferred payment agreements; handling district administrative reports (Personnel, Automotive, Affirmative Action); and assisting the Bookkeeper with some of their duties or relieving in their absence.

New full-time or part-time cashiers with prior Company experience, other prior work experience, or advanced education beyond high school may enter at a higher level than C-02. Depending on the amount and quality of that education and experience, they could enter in any of the top three cashier grades. Entry at the grades of C-04 or C-05 must be approved by the Vice President-Division Operations."

The clerk's rate of compensation is based on his or her classification. When Motley was hired, she was classified as a "part-time cashier, clerk II." In February 1988 Motley was promoted to a "clerk III." The other three clerks were classified as "clerk V" because they had over 10 years of experience and service.

On Motley's August 9, 1989, employee evaluation, completed by her supervisor, Merle Brogdon, Motley received an overall "meets expectation" rating. She also was rated as "below expectation" on volume production. The Company contends other employees were also asked to increase their production.

After receiving her evaluation, Motley approached Reginald Ankrom, the area superintendent. Motley told Ankrom she had a communication problem with Brogdon and was dissatisfied with her evaluation. On August 29, 1989, Motley resigned her position. Ankrom and Brogdon requested Motley reconsider her decision or accept another position with the Company. Motley rejected both suggestions.

Motley's job was filled by another black woman, Monica Hawkins, who was transferred from another position in the Company. Due to Hawkins' experience and her assumption of other duties in addition to those previously performed by Motley, she was classified as a "clerk V."

On September 25, 1989, Motley filed a complaint with the Commission. In this complaint Motley alleged she did not receive equal pay, she was discriminated against due to her race, and she was constructively discharged as she resigned her position due to harassment by Brogdon. With respect to the harassment, Motley alleged:

> "Mr. Brogdon criticized my performance and my speech. On one occasion, he suggested that I needed to take a course in English. Prior to August, 1989, all of my evaluations had been good. In the evaluation done on August 2, 1989, my performance was not satisfactory. Mr. Brogdon made comments about my husband and my mother. He also said that I irritated him every time I passed his office. He said that he timed me every time I talked to another black employee."

During the Commission's investigation of Motley's complaint, Motley told the Commission Brogdon had stated "you irritate me everytime you go by my office," and "it probably bothers you that your husband is sitting at home all day since he is retired." Motley additionally alleged Brogdon timed her on one occasion when she was socializing with another employee on company time. Finally, Motley stated that on one occasion she complained to Brogdon a customer called her a "nigger," and Brogdon replied he had come from a small town also and what did Motley want the customer to call her. Motley stated the "last straw" was being rated "below expectation" on her evaluation.

Motley admitted Mary Klossing, another supervisor, spoke with her in early August, at Brogdon's request. Klossing told Motley she was doing a good job and should not resign. Klossing also told Motley Brogdon had communication and personality problems with the other clerks as well, but things ultimately worked out.

Ankrom told the Commission Motley had not been requested to take an English Communication course because she is black. Rather, 10 of the 12 employees in positions comparable to Motley's position had taken the class. Of these 10 employees, 8 are white and 2 are black. Additionally, Brogdon himself had taken the course. Ankrom additionally stated Motley's job performance was generally acceptable, although she had been asked to refrain from socializing during working hours.

The Commission found the Company provided a legitimate nondiscriminatory reason for the difference in salary earned by Motley and the other clerks. The Commission additionally found there was a lack of substantial evidence to support Motley's contention she had been harassed. Accordingly, the Commission dismissed Motley's complaint. Motley appeals.

## DISCUSSION

The legislature has provided for direct review of final orders of the Commission by the appellate court. (Ill. Rev. Stat. 1989, ch. 68, par. 8—111(A)(1).) The reviewing court will not disturb the Commission's findings of fact unless they are found to be against the manifest weight of the evidence. (Ill. Rev. Stat. 1989, ch. 68, par. 8—111(A)(2).) The Commission is empowered to dismiss a complaint if, after investigation, it determines there is a lack of substantial evidence to support the complainant's charge. (Ill. Rev. Stat. 1989, ch. 68, par. 7A—102(D)(2).) It is within the Commission's discretion whether to dismiss a charge for lack of substantial evidence. On review, the dismissal will be reversed only if it was arbitrary and capricious or an abuse of discretion. *Castillo v. Human Rights Comm'n* (1987), 159 Ill. App. 3d 158, 162-63, 512 N.E.2d 72, 75.

Motley contends she performed the same duties as her white co-workers, yet they were classified as "clerk V," while she was classified as "clerk III," with the result she earned a lower wage than her white co-workers. Motley's argument implies her co-workers were elevated to "clerk V" status because they were white, while she remained classified as a "clerk III" because she is black. Sections 2—102(A) and 1—103(Q) of the Human Rights Act (Act) make it unlawful for an employer to make promotional decisions regarding an employee on the basis of race. Ill. Rev. Stat. 1989, ch. 68, pars. 2—102(A), 1—103(Q); see *Board of Regents for Regency Universities v. Human Rights Comm'n* (1990), 196 Ill. App. 3d 187, 195, 552 N.E.2d 1373, 1379.

In analyzing employment discrimination claims, a three-part analysis is employed. First, the employee must establish a *prima facie* case. Once a *prima facie* case is established, a presumption arises the employer unlawfully discriminated against the employee. Second, in order to rebut the presumption, the employer must articulate a legitimate nondiscriminatory reason for the challenged action. (*Board of Regents*, 196 Ill. App. 3d at 195, 552 N.E.2d at 1379.) If the employer does so, the presumption of discrimination drops. In the third stage, the employee must prove by a preponderance of the evidence the employer's articulated reason was a pretext for unlawful

discrimination. This burden merges with the employee's burden of persuading the trier of fact the employer unlawfully discriminated against the employee. *Board of Regents*, 196 Ill. App. 3d at 196, 552 N.E.2d at 1380.

■ In order to prove a *prima facie* case of discrimination the complainant must show: (1) she is a member of a group protected by law; (2) she was treated in a certain manner by the employer; and (3) she was treated differently than similarly situated employees who are not members of the protected group. (*Warren Achievement Center, Inc. v. Human Rights Comm'n* (1991), 216 Ill. App. 3d 604, 607, 575 N.E.2d 929, 931.) Motley has not satisfied the third element, namely, that she was treated differently than *similarly situated* white employees. Motley's term of employment was significantly shorter than the terms of employment of the other clerks. Motley was employed by the Company for four years while the other clerks had been employed for over 10 years. This is significant because length of employment is a component of the Company's written advancement policy.

■ The Act specifically states an employer may properly apply different standards of compensation, or different terms, conditions or privileges of employment pursuant to a merit or retirement system provided such system or its administration is not used as a subterfuge for, or does not have the effect of, unlawful discrimination. (Ill. Rev. Stat. 1989, ch. 68, par. 2—104(A)(5)(a).) The Company's written advancement policy is essentially a merit system comprised of two components: (1) job knowledge and performance and (2) length of service. Employees satisfying these components are advanced to higher classifications and receive a corresponding increase in compensation. Motley, who was employed by the Company for four years, had not satisfied the length of service component which would enable her to be classified as a "clerk V." Her co-workers, conversely, had each been employed by the Company for more than 10 years and had satisfied the length of service component. Therefore, they are eligible for "clerk V" classification. The record indicates Motley received less compensation than her co-workers, not because of differences in their races, but because of a written, nondiscriminatory merit system.

Motley alleges the written guidelines ought not be accepted as a legitimate explanation for the disparity in compensation paid to herself and her co-workers. She contends although her advancement, and therefore her rate of compensation, was governed by the guidelines, the guidelines were not applied to all other employees. We reject this contention as Motley has neither alleged nor established other employees were permitted to advance from one

level of classification to the next without satisfying the length of service requirement.

We are unable to accept Motley's contention the guidelines were disregarded because Motley's replacement, Monica Hawkins, was classified as a "clerk V." This classification does not represent a departure from the guidelines. According to the guidelines, a new cashier/clerk may be *initially* classified at a level higher than "clerk II" if the new cashier/clerk has prior Company experience. The record reflects Hawkins was transferred to the cashier/clerk position from another position within the Company. Thus, Hawkins had prior Company experience and was, therefore, eligible for initial cashier/clerk classification at any of the levels.

Moreover, we note Hawkins, like Motley is a black female. Motley's argument she was classified as a "clerk III" because she is black while others are classified as "clerk V" because they are white is weakened by the fact Hawkins, a black employee, was classified as a "clerk V."

Accordingly, the record indicates Motley received less compensation than her white co-workers, not because she is black, but because her co-workers had more seniority. Motley, therefore, failed to establish she was treated differently than *similarly situated* employees. Since Motley did not establish a *prima facie* case of discrimination, the Commission's dismissal of her claim was not an abuse of discretion.

■ We also find the Commission did not abuse its discretion in dismissing Motley's constructive discharge claim. Constructive discharge occurs when an employee's working conditions are made so intolerable by the employer that the employee, acting as a reasonable person, is compelled to resign. (*Steele v. Illinois Human Rights Comm'n* (1987), 160 Ill. App. 3d 577, 581, 513 N.E.2d 1177, 1179-80.) The Illinois Appellate Court has previously relied upon Federal cases arising under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000a *et seq.* (1976)). *Steele*, 160 Ill. App. 3d at 581, 513 N.E.2d at 1179.

The focus in a constructive discharge case is whether a reasonable person in plaintiff's position would feel compelled to leave her job. In the course of most, if not all, people's employment, a wide variety of disappointments, and possibly some injustices, occur. Most of these are normal incidents of employment that would not lead a reasonable person to quit. An employee may not be unreasonably sensitive to his or her working environment. (*Phaup v. Pepsi-Cola General Bottlers, Inc.* (N.D. Ill. 1991), 761 F. Supp. 555, 570.) In *Phaup*, the court noted, reasonable people endure disappointments such as

stares, criticism of performance, and now and then an unfortunate statement such as that a person is too heavy for the job. None of these disappointments, either separately or combined, create working conditions so intolerable as to force a reasonable person to quit. The court concluded, even if a supervisor were considered a heavy-handed manager who dealt poorly with subordinates, that kind of manager is, unfortunately, not a rare breed, and simple mismanagement does not constitute constructive discharge. *Phaup*, 761 F. Supp. at 571.

To create a hostile environment, the misconduct "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive work environment.'" (*Saxton v. American Telephone & Telegraph Co.* (N.D. Ill. 1992), 785 F. Supp. 760, 765, quoting *Meritor Savings Bank v. Vinson* (1986), 477 U.S. 57, 67, 91 L. Ed. 2d 49, 60, 106 S. Ct. 2399, 2405.) In *Saxton*, the employee claimed her supervisor harassed her by not speaking to her, acting in a condescending manner, and teasing her about her personal relationship with another employee. (*Saxton*, 785 F. Supp. at 762.) The court found, accepting the employee's allegations as true, they were inadequate to establish a hostile work environment. *Saxton*, 785 F. Supp. at 765.

Similarly, in *Harriston v. Chicago Tribune Co.* (N.D. Ill. 1991), 771 F. Supp. 933, 938-39, the court rejected an employee's claim she had been constructively discharged. The court noted constructive discharge is established only when an employer makes an employee's working environment so intolerable the employee is forced into an involuntary resignation. The working conditions must have been so onerous or demeaning the employee has effectively been fired in place and compelled to leave. (*Harriston*, 771 F. Supp. at 938.) Harriston was employed in the defendant's advertising department. After her first year of employment, Harriston was evaluated and received an overall rating of "satisfactory," but was criticized regarding her level of sales. Approximately one year later, after sales had continued to decline, Harriston's supervisor sent her a memo stating his dissatisfaction over the situation. The memo did not threaten Harriston's job status, but included a three-week deadline for Harriston to respond to the various criticisms in the memo. Instead of responding, Harriston resigned. (*Harriston*, 771 F. Supp. at 936.) Harriston alleged she had been constructively discharged because her supervisor engaged in a harassment campaign which included making it difficult for her to sell advertising, reprimanding her more seriously than white salespersons when her sales figures declined, excluding her from office activities, and failing to adequately respond when her car was vandalized in a company parking lot. (*Harriston*, 771 F. Supp. at

938-39.) The court found Harriston's allegations were insufficient as a matter of law to establish a constructive discharge. *Harriston*, 771 F. Supp. at 939.

Motley alleges she was compelled to resign because Brogdon made inappropriate comments to her, requested her to take an English Communication course and rated her "below expectation" with respect to her volume of production. Accepting all of Motley's allegations as true, we are unable to find the working conditions were intolerable and a reasonable person would resign as a result. Being asked to take a course which the majority of other employees, regardless of their race, are also requested to take does not result in the creation of intolerable working conditions. Nor does a "below expectation" rating in one area cause intolerable working conditions. As noted by the courts in *Phaup* and *Harriston*, criticism of performance is merely one of the disappointments which one must endure during the course of employment. Finally, while Brogdon's comments may not have been models of propriety and examples of effective communication, they are not adequate to establish an intolerable work environment. The Commission did not abuse its discretion in dismissing Motley's complaint of constructive discharge.

The order of the Commission is affirmed.

Affirmed.

COOK and STEIGMANN, JJ., concur.