NO. 4-98-0054

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

KAREN M. STONE,                        )   Administrative

Petitioner,                  )   Review of the

v.                           )   Human Rights

THE DEPARTMENT OF HUMAN RIGHTS,        )   Commission

THE HUMAN RIGHTS COMMISSION, and       )   No. 1996SF0130

THE VILLAGE OF RIVERTON, ILLINOIS,     )

a Municipal Corporation,               )

Respondents.                 )

_________________________________________________________________

JUSTICE KNECHT delivered the opinion of the court:

Petitioner, Karen Stone, brings this direct review (155 Ill. 2d R. 335) of an order of the Illinois Human Rights Com­mis­

sion (Commis­sion), sus­tain­ing the Illinois Department of Human Rights' (Department) dis­missal of petitioner's charg­es against the Vil­lage of Riverton (Vil­lage) of gender discrimi­nation in employment and of retaliation resulting in a construc­tive dis­

charge from her employment.  775 ILCS 5/8-111(A)(1) (West 1996). 

The issues are whether (1) the Department and the Com­

mission used the correct legal standard for determining whether petitioner offered sufficient substantial evidence to justify the issuance of a complaint; and (2) whether the decision of the Commission to dismiss her charges constituted an abuse of discre­

tion.

Petitioner's charges of discrimination, filed September 7, 1995, al­leged she was hired in August 1993 by the Village as a part-time police officer and applied for two openings for full-

time police offi­cers in 1995 but was not hired in favor of male candi­dates both times.  She later added an amendment to her charges on December 5, 1996, alleging the Village improperly re­

taliated against her resulting in a constructive discharge from her job on September 6, 1996.

In support of her charges, petitioner stated she was doing a good job in her position as a part-time police officer and she was qualified for the full-time position.  She claims the Village treated female applicants differently from male appli­

cants.  Her qual­i­fi­ca­tions in­clud­ed 10 years' em­ploy­ment with the Sangamon County sheriff's depart­ment as a dis­patch­er, two years' employment as a part-time police offi­cer with the Vil­lage and service with the Sangamon Coun­ty sher­iff's auxilia­ry pa­trol for five years.  Peti­tioner did not have any training with the Police Train­ing In­sti­tute (PTI), but she did have other train­ing, in­

clud­ing seven years with the Unit­ed States Air Force and the Illinois Air Na­tion­al Guard in muni­tions work, canine train­ing for 14 weeks, and various training programs offered by the Vil­

lage and the Sangamon County sheriff.       

The first full-time position with the Village for which petitioner applied was given to Thomas Maybury.  Maybury's quali­

fications consisted of two years in his part-time posi­tion with the Village, five years with the auxil­ia­ry sheriff's patrol with the Sangamon County sheriff and five years as a cor­rections offi­

cer with the Sangamon County sheriff.  His training in­clud­ed 200 hours of PTI training in the cor­rections division at the Univer­

sity of Illinois.  Petitioner states in her affida­vit filed with the Commission upon review of the Department's deci­sion, Maybury's PTI training was in the spe­cial­ized area of cor­rection­

al officer training and is not credit­able toward gen­eral PTI training.  She admits in the same affidavit she and Maybury have com­parable firearms training.

The notice the Village provided of the opening for the full-time police officer position stated the position was for federally funded "Community Oriented Policing."  It did not state PTI train­ing of any kind was required for the position.  How­ever, the Village took into account the PTI hours Maybury had accumu­

lated that petitioner did not have.  Marti Dove, a mem­ber of the administrative committee for the Vil­lage which inter­viewed the job applicants, stated PTI training is an issue because it is a statu­tory requirement officers meet the require­ments set out by the Police Training Board.  Dove and other mem­bers of the in­ter­

view committee stated petitioner did not inter­view well but, rath­er, tried to convince the commit­tee of the value of canine po­lic­ing that she could offer the Vil­lage and tried to sell her dog rath­er than herself in her inter­view.  Petitioner states in her affi­davit she spoke only twice about her dog and once was in response to a question from the commit­tee.  

Petitioner states Todd Wil­liams, a member of the inter­

view committee, asked her if she felt she could get along with the men in the police force as it was all male and asked her if she could han­dle the job be­cause she was a woman and also small in stature.  Wil­liams did not re­call making any refer­ence to peti­tioner being a small woman but did state he asked if she were aware there were no other female offi­cers on the force.

The Department found in its report petitioner and Maybury were equally qualified for the job except for Maybury's 200 hours of PTI training.  Further, the Department de­ter­mined Maybury interviewed better and petitioner did not show the Village's responses were pretext.  The Commis­sion found the Vil­

lage asked all applicants if they had PTI training, which the Village contended was required by statute, and Maybury, unlike petitioner, had this training.  The record does not establish whether the kind of PTI training Maybury received was that re­

quired by statute.  The Com­mis­sion went on to find the Department's in­ves­ti­ga­tion did not re­veal the Village's stat­ed reason for hiring Maybury instead of petitioner was a pre­text for sex dis­crimina­tion.

The second full-time position for which petitioner applied was given to Daniel Parrish.  Petitioner al­leg­es she was doing a good job in her part-time position and was quali­fied for the full-time posi­tion.  Petitioner again alleges the Vil­lage treated male officers dif­ferently from female offi­cers.  Peti­

tion­er felt she and Parrish were equally quali­fied.  Parrish also was a part-time offi­cer with the Vil­lage and he had three years' se­nior­ity on petitioner.  His full-time job was with the Sangamon Coun­ty sheriff's de­partment as a court secu­rity offi­cer, a posi­

tion he had held for six years.  He also had expe­ri­ence as a correc­tions supervi­sor.

The interview committee felt Parrish was better quali­

fied because his experience with the court system and court secu­

ri­ty was "hands on" while petitioner was only a dis­patch­er; he lived in the Vil­lage, which petitioner did not, and was ac­tive in the com­mu­ni­ty activities; he had worked for the Vil­lage three years lon­ger than petitioner; petitioner's de­meanor dur­ing her inter­view was poor and she again made too many refer­ences to how her dog could help the community.    

The Department's findings were that both petitioner and Parrish were qualified for the position but the committee felt Parrish was better qualified based on his experience and visi­

bili­ty and rapport in the commu­nity; Parrish in­ter­viewed bet­ter than petitioner; and petitioner did not show the Village's rea­

sons were pretext.  

The Commission found petitioner alleged Parrish was less qualified than she but the Village contended Parrish was more qualified because he had more experience in the court sys­

tem.  Further, the evidence did not establish the Village's stat­

ed rea­son for hiring Parrish was a pretext for sex discrimina­

tion.

Petitioner's final charge is the Village construc­tive­ly discharged her by engaging in retaliatory actions after she filed her initial discrimination charges.  Petitioner asserts after she filed her discrimination charges she was sched­uled to work on days she said she was unable to work and then she was required to get substitutes and her hours worked thus de­creased.  She was sched­uled to work mid­night shifts more fre­quently, which in­ter­

fered with her daytime job.  The po­lice chief was a "DARE" offi­

cer and was gone during the day shift.  He asked other offi­cers to cover for him but never asked petitioner.  The number of total hours petitioner was as­signed de­creased.  The chief start­ed to re­turn her writ­ten po­lice re­ports to her because they were not fully com­pleted when previously she had been praised for her work.  Petitioner claims her reports were no different than be­

fore she filed her charges.  Petitioner was told she could no longer take her lunch break at the end of her shift even though she had al­ways obtained permis­sion from the chief to do so.  The Village had, prior to filing her charges, al­lowed petitioner to respond to requests for canine calls from other ju­ris­dic­tions and pro­vided monetary assis­tance toward the up­keep of her dog, but the policy changed drasti­cally after she filed her charges to limit her ability to respond to re­quests for canine calls and the mone­tary assistance was also low­ered.    

Finally, the Village told petitioner part-time posi­

tions would be elim­i­nat­ed because the Village was moving to a full-time po­lice de­partment.  Petitioner stated she re­signed because she believed her posi­tion was going to be elimi­nated and, since she needed other part-time work, she took a job else­where.   These are the reasons given in the letter of resig­na­tion.  How­

ever, petitioner also stat­ed she felt she had to re­sign be­cause of the stress the Village's retaliatory acts were causing in her life and she would not have taken an­other posi­tion ex­cept she was subjected to a continuing reduc­tion in hours and assign­ments that were incom­patible with her full-time job.  Petitioner states in her affida­vit filed with the Commis­sion on review that she has dis­covered, follow­ing her res­igna­tion, the Vil­lage has not elimi­

nat­ed part-time police offi­cers and filled her position with a male. 

In petitioner's let­ter of res­igna­tion she stat­ed she was re­sign­ing because of un­cer­tainty as to whose part-time posi­

tion would be eliminated and she had ob­tained employ­ment else­

where.  The Village and the Department point to the letter as evi­dence petitioner did not re­sign due to the ad­verse ac­tions she alleges were taken by the Vil­lage.  They point out her let­ter admits she was un­sure if she would be affect­ed by job elimina­

tions.    

The Village and the Department maintain the remain­ing rea­sons petitioner states for resigning would not have com­pelled a rea­son­able person to re­sign.  The De­partment points out peti­

tioner ad­mits the con­flict in shift schedul­ing may have been a mis­take.  Reports were sent back to other offi­cers as well as complainant.  The po­lice de­part­ment in­sti­tuted an of­fice-wide policy of pre­cluding employ­ees from tak­ing their lunch hour at the end of their shift be­cause there would be no protec­tion for the Vil­lage.  The changes in the canine poli­cies were in­sti­tuted for liabili­ty purpos­es because petitioner was in the uni­form of a Village police officer when respond­ing in other juris­dic­tions.    The changes in the reim­bursement of expenses for petitioner's dog were a cost-sav­ing measure.  

The Department found petitioner as well as other of­

ficers had reports returned because they lacked detail in in­for­

mation required for the computer package; all offi­cers re­ceived a memo stating no one could take lunch at the end of a shift be­

cause the Village would be unprotected; petitioner's shift re­

quests could not always be honored because of the number of peo­

ple in the rotation and because vacation time had to be cov­ered; petitioner admitted it might have been a mistake when she was scheduled to work on days that overlapped her shifts at the sher

iff's department; restrictions on canine calls were due to lia­

bili­ty con­cerns; petitioner stated she submitted her let­ter of resig­nation because she had been told her position would be elim­

inat­ed; and peti­tioner did not show the Village's rea­sons for its actions were pretext.  

The Commission found the evidence did not establish the Village's conduct amounted to constructive discharge or that the actions that petitioner alleged amounted to constructive dis­

charge were the result of her filing a charge with the Depart­

ment.  The Commission further found petitioner's affi­davit filed with her request for review provided more details of her specific allega­tions of retaliation but she did not pro­vide any reason for not providing these details during the De­partment's investiga­

tion. 

In analyzing employment discrimination actions brought under the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 
et
 
seq
. (West 1996)), a three-part analysis first articu­lated by the Su­preme Court in 
McDonnell Douglas Corp. v. Green
, 411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 677-79, 93 S. Ct. 1817, 1824-25    (1973), is used.  

"First, plaintiff must establish by a pre-

ponderance of the evidence a 
prima
 
facie
 

case of unlawful discrimination.  If a 

prima
 
facie
 case is established, a rebut-

table presumption arises that the employer

unlaw­ful­ly discriminated against plaintiff.

Second, to rebut the presumption, the em­-

ploy­er must articu­late, not prove [citation],

a legitimate, nondiscriminatory reason for

its deci­sion.

Finally, if the employer carries its 

burden of produc­tion, the presumption of 

unlaw­ful discrimination falls and plain­tiff

must then prove by a preponderance of the 

evidence that the employer's articulated 

reason was not its true reason, but was in-

­stead a pretext for unlawful discrimination.  

This merges with plaintiff's ultimate bur­den

of persuading the trier of fact that the 

employer unlawfully discriminated against 

plaintiff.  [Citation.]  This ultimate 

burden remains at all times with plaintiff.

[Citation.]"  
Zaderaka v. Human Rights Comm'n
, 

131 Ill. 2d 172, 178-79, 545 N.E.2d 684, 687 

(1989).

Petitioner argues that, based on 
Whipple v. Department of Rehabilitation Services
, 269 Ill. App. 3d 554, 556-57, 646 N.E.2d 275, 277 (1995), the Department and the Commission should not have considered the second and third prongs of the anal­ysis.  In 
Whipple
, this court concluded a decision to dismiss a charge after the Department investigation must be based on the insuffi­

ciency of the 
prima
 
facie
 case alone
.  Ac­cord­ing to 
Whipple
, going into the second and third 
prongs of the 
Zaderaka
 analysis would inherently bring into play a balancing of evi­dence.  
Whipple
, 269 Ill. App. 3d at 556-57, 646 N.E.2d at 277.

A conflict in authority has developed on whether only the first prong of the analysis can be considered at the in­ves­

tigative stage.  In 
Alcequeire v. Human Rights Comm'n
, 292 Ill. App. 3d 515, 520, 685 N.E.2d 974, 977 (1997), the court dis­agreed with 
Whipple
 and said the consideration of a dismissal of a charge for lack of substantial evidence need not be restricted to the 
prima
 
facie
 prong but may also include an analysis of wheth­er the employer has articulated a legitimate reason for the ac­tions taken and the petitioner has not shown the reasons are pretext.  

We have reconsidered the 
Whipple
 decision and conclude it does not correctly state the law.  See 
Webb v. Lustig
, No. 4-

97-0625 (September 4, 1998), ___ Ill. App. 3d ___, ___ N.E.2d ___.  If the De­part­ment and the Com­mis­sion can­not con­sid­er the second and third prongs of the analy­sis, this would undu­ly re­

strict their in­ves­ti­ga­tive au­thori­ty.  In deter­min­ing whether a charge filed by a com­plain­ant should go forward, the Director of the Depart­ment is charged with determin­ing wheth­er there is "sub­

stan­tial evi­dence that the al­leged civil rights violation has been commit­ted."  775 ILCS 5/7A-102(D)(2) (West 1996).  

In making such a determination, the Department and Commission should be able to consider at the initial stag­es whether a legitimate reason for an employer's actions exists because the petitioner's 
prima
 
facie
 case sets up only a rebut­

table pre­sump­tion discrimination occurred.  As noted in 
Alcequeire
, the Commission's limited resources would then be used only for those cases where there is substantial evidence the employer's stat­ed rea­sons for its discriminatory actions are pre­

text.

Further, we note the section of the Act dealing with the determination of whether there has been substantial evidence an alleged civil rights violation has occurred has been amend­ed for all causes of action filed after January 1, 1996, to clarify that this de­ter­mi­na­tion in­cludes not only find­ings of fact and conclu­sions but also "the reasons for the deter­mina­tions on all material is­sues and questions of credi­bili­ty."  775 ILCS 5/7A-

102(D)(2), (H) (West 1996).  Thus, there is no longer a need to restrict a consideration of substantial evidence to the 
prima facie
 to avoid a balancing of evidence.  The statute ex­pects the investigation phase to involve such a balancing and to deter­mine whether substantial evidence exists as to each of three prongs of the analysis.

Under the Act as it existed for causes of action filed before January 1, 1996, after the De­part­ment has con­duct­ed its in­ves­ti­ga­tion of a com­plaint, the Director of the Depart­ment re­

views the in­ves­ti­ga­tive report to determine whether there is substan­tial evi­dence the alleged civil rights violation oc­curred.  775 ILCS 5/7A-102(D)(2) (West 1994).  If the Director determines there is no substantial evi­dence, the com­plaint is dismissed and the com­plainant may then seek review of the Depart­ment's dismiss­

al with the Commission.  775 ILCS 5/7A-102(D)(2)(a) (West 1994).  On review, the Commis­sion may consider the Department's report, any argument and sup­plemental evidence sub­mitted, the results of any additional in­vestigation conducted by the Department in re­

sponse to the re­quest for review and, in its discretion, may hold a hearing into the factual basis of the issues presented.  775 ILCS 5/8-103(B) (West 1994).  Final orders of the Commission are sub­ject to re­view by the appellate court.  775 ILCS 5/8-111(A)(1) (West 1994).  While any findings of fact by the Commission may only be re­versed if they are con­trary to the manifest weight of the evi­dence (775 ILCS 5/8-111(A)(2) (West 1994)), the proper standard of review of the ulti­mate deci­sion of the Commission to dismiss a complaint for lack of sub­stantial evi­dence is whether the order constituted an abuse of discretion or was arbitrary and capricious.  
Alcequeire
, 292 Ill. App. 3d at 519-20, 685 N.E.2d at 976; 
Whipple
, 269 Ill. App. 3d at 556, 646 N.E.E.2d at 277;  
Peck v. Department of Human Rights
, 234 Ill. App. 3d 334, 337, 600 N.E.2d 79, 81 (1992).

Substantial evidence means more than a mere scintilla but less than a preponderance of the evidence.  
Alcequeire
, 292 Ill. App. 3d at 519, 685 N.E.2d at 976; 
Metro Utility v. Illi­nois Commerce Comm'n
, 193 Ill. App. 3d 178, 184, 549 N.E.2d 1327, 1330-31 (1990).  Sub­stan­tial evi­dence is such rele­vant evi­dence as a rea­son­able mind might accept as ade­quate to support a con­

clu­sion.  
Sanders v. United Parcel Service
, 142 Ill. App. 3d 362, 364-65, 491 N.E.2d 1314, 1317 (1986).   

To establish a 
prima
 
facie
 case of employment dis­crim­

ination, a complainant must show (1) she is a member of a pro­

tect­ed class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected despite her qualifications; and (4) after she was reject­ed, the position remained open and the employer sought other ap­pli­cants from persons of complainant's qualifications.  See 
McDonnell Doug­las
, 411 U.S. at 802, 36 L. Ed. 2d at 677, 93 S. Ct. at 1824; 
Schoneberg v. Grundy County Special Education Coo­perative
  67 Ill. App. 3d 899, 903, 385 N.E.2d 351, 356 (1979).  In this case, petitioner's first two charges in­volved this stan­dard of proof.

In the case of the first charge, Maybury's PTI training makes him more qualified for the position than petitioner not­withstanding her statements in her affidavit Maybury's PTI train­

ing was not "real."   Those statements are not substanti­at­ed in any way.  Further, petitioner did not interview well, spending too much time talking about her dog.  Petitioner failed to show the Village's reasons for hiring Maybury, PTI training and better interview, were pretext.

As for the second charge involving the hiring of Parrish in­stead of petitioner, the evidence indicated the quali­

fica­tions of petitioner and Parrish were equal.  An em­ployer need not hire an applicant just because she is in a pro­tected class if she is only equally or less qualified than an applicant who is hired.  The comments of the Supreme Court dis­cussing Title VII would seem to apply to complaints brought under the Act also:  

"Title VII, however, does not demand that

an employer give preferential treatment

to minorities or women.  [Citations.]

The statute was not intended to 'diminish

traditional management prerogatives.'

[
United Steelworkers of America v. Weber
, 

443 U.S. 193, 207, 61 L. Ed. 480, 491, 99 

S. Ct. 2721, 2729 (1979)]."  
Texas Department

of Com­muni­ty Affairs v. Burdine
, 450 U.S. 248, 

259, 67 L. Ed. 2d 207, 219, 101 S. Ct. 1089, 

1096 (1981).

When qualifications are equal, an employer is not obligated to accord a preference to a minority or female applicant over a white male applicant.  "Rather, the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria."  
Burdine
, 450 U.S. at 259, 67 L. Ed. 2d at 219, 101 S. Ct. at 1097. 

The Village's hiring committee believed Parrish's expe­

ri­ence was more "hands on" and he had visibility in the community be­cause he lived there and was active in community events.  There was also a finding Parrish interviewed better than petitioner, who still talked about her dog.  Petitioner was not able to show the Village's reasons for hiring Parrish, community visibility, more experience in the court system and a better interview, were pre­text for sex discrimination.

Finally, to show a 
prima
 
facie
 case of retali­a­tion a petitioner must show the following: (1) she engaged in a pro­tect­

ed activity; (2) the employer committed an adverse act against her; and (3) a causal connection existed between the pro­tected activity and the adverse act.  
Carter Coal Co. v. Human Rights Comm'n
, 261 Ill. App. 3d 1, 7, 633 N.E.2d 202, 207 (1994).

A constructive discharge occurs when an employee's working condi­tions are made so intolerable the employee, acting as a reason­able person, is compelled to resign.  The focus in such a case is on a reasonable person's reaction to the petitioner's situation.  
Motley v. Human Rights Com­m'n
, 263 Ill. App. 3d 367, 373, 636 N.E.2d 100, 104 (1994).

The evidence did not sup­port a 
prima
 
facie
 case of retaliation because most of the actions petitioner viewed as adverse were not com­mit­ted just against petitioner but applied to all offi­cers.  Thus, the fact they occurred shortly after peti­

tioner filed her charges with the Department does not show a caus­al link be­tween the charges and the actions.  Further, the ac­tions taken were not of such magni­tude a reasonable per­son would re­sign a posi­tion.  
The Village's rea­sons for its ac­tions were all lawful and legitimate.  There is no evi­dence sup­port­ing a find­ing they were a pretext.  

The Commission's decision dismissing each of the three charg­es was not an abuse of discretion nor was it arbitrary and ca­pri­cious. The decision of the Commission is affirmed.

Affirmed. 

COOK and GREEN, JJ., concur.